Steven COLE, Appellant

v.

The STATE of Texas

NO. PD–0077–15

Court of Criminal Appeals of Texas.

DELIVERED: May 25, 2016

Ebb B. Mobley, Longview, for Appellant.

John R. Messinger, Asst. State Prosecuting Attorney, Lisa C. McMinn, State's Attorney, Austin, for the State.

## OPINION

Keasler, J., delivered the opinion of the Court, in which Keller, P.J., and Meyers, Hervey, Alcala, Richardson, and Newell, JJ., joined.

At Steven Cole's intoxication-manslaughter trial, the judge overruled Cole's motion to suppress evidence obtained by a warrantless blood draw. Holding that the record did not establish exigent circumstances, the court of appeals reversed the trial court's judgment. We conclude that the record established circumstances rendering obtaining a warrant impractical and that the warrantless search is justified under the exigency exception to the Fourth Amendment's warrant requirement. We accordingly reverse and remand the case to the court of appeals.

### I.

#### A. Trial

At 10:30 p.m. in early December 2011, Steven Cole drove his large pickup truck

110 miles per hour down a city street in Longview. Running the red light at a busy intersection, Cole struck Jim Hightower's pickup truck causing an explosion and engulfing Hightower's truck in flames. Hightower was killed instantly.

Longview Police Department Officer Castillo was the first officer to arrive at the accident scene. He approached the burning truck and saw Hightower in the driver's seat, but he was not sure if Hightower was dead or alive. At the other end of the accident scene, he saw Cole's truck against a nearby building with fire approaching it. Cole was in the driver's seat yelling for help, but Castillo could not open the doors. By this time, other officers arrived on the scene and began attempting to put out the fires. With the help of the other officers, Castillo was able to remove Cole from his heavily damaged truck's driver's seat. Castillo then started to secure the area to make sure nobody entered the accident scene.

Even at that time of night, there was still considerable activity and traffic in the area of the accident. Because of the traffic and activity, Castillo testified that, from a law enforcement and public safety perspective, they needed as many officers on the scene as they could possibly get. The fire and its continued explosions required keeping people away for their own safety. The fire's danger required blocking off several major intersections around the area. Castillo testified that the accident occurred around a shift change, when officers would be leaving evening shifts and others arriving for the late-night shift. This further complicated satisfying the manpower needed to secure the scene, conduct an investigation, and maintain public safety.

When Officer Wright arrived at the scene, she spoke to Cole who was sitting on the ground away from the burning truck and wreckage. Cole was confused and did not know where he was. EMS arrived and started evaluating Cole's injuries. While being evaluated, Cole told EMS that he had taken "some meth." At the hospital, Wright described Cole as mumbling incoherently to himself and experiencing involuntary leg and hand movements. Wright described this behavior as "tweaking"—a condition consistent with methamphetamine intoxication.

Officer Higginbotham was the lead accident investigator and officer investigating whether a crime was committed. That night he had finished his shift, but was called back out into the field to coordinate and lead the accident investigation. At the time he arrived, Cole had already been transported to the hospital. He discovered a large debris field that spread beyond the intersection and nearly a full block long. He noted extensive damage to Hightower's truck's driver side. The damage indicated that the truck was broadsided or "T-boned" that bent the frame of the truck into a crescent shape. As the accident investigator, Higginbotham spent approximately three hours investigating the scene of the accident. He testified that fourteen officers were dispatched to assist with the scene. Like Officer Castillo, Higginbotham testified that securing the accident scene required a significant number of officers. According to Higginbotham, those officers were needed because the accident scene's location was in a large, busy downtown intersection and that the accident investigation could become compromised if the area was not blocked off. The entire accident scene was not cleaned up and cleared until 6:00 the following morning.

At the direction of her superior officer, Wright arrested Cole at 11:38 p.m. and attempted to obtain a sample of his blood by first reading the statutory warning to

Cole. Cole frequently interrupted Wright's reading of the warnings, insisting that he used "meth" and was not drunk, every time she read the word "alcohol" or "intoxication" in the statutory warning. Cole refused to provide a blood sample. Wright then requested hospital staff to draw Cole's blood. His blood was drawn at 12:20 a.m., forty-two minutes later. Subsequent testing and trial testimony revealed that Cole's blood contained intoxicating levels of amphetamine and methamphetamine.

At trial, Cole moved to suppress the results of the blood sample and the testimony concerning the warrantless search. In a hearing outside the jury's presence, Higginbotham testified that, before he arrived and conducted his investigation, there was no one else who could have determined the nature and cause of the accident or who was at fault. Although he did not try to get a warrant with an on-call judge, Higginbotham testified that he was unable to leave the scene to go to the courthouse and speak to a prosecutor to secure a warrant for Cole's blood. According to Higginbotham, the warrant process takes an hour to an hour-and-a-half "at best," and it was not feasible to wait until the accident investigation was entirely complete before securing a warrant. Higginbotham also expressed concern that medical intervention and treatment—specifically the administration of medicine and especially narcotic medicines—could affect the integrity of a blood sample. To assign another officer at the scene the responsibility to obtain a warrant, Higginbotham asserted, would leave an essential duty unfulfilled.

The judge overruled Cole's motions to suppress during trial and made several verbal findings and conclusions. First, the judge held that the United States Supreme Court's holding in *Missouri v. McNeely*[1] did not overrule Transportation Code Chapter 724. Second, the judge concluded that exigent circumstances justified the warrantless seizure and found the following circumstances distinguished the present case from *McNeely*:

- the accident required shutting down a major intersection;

- the accident's severity and large debris field required the accident reconstruction expert to remain at the scene;

- the number of officers involved and the time to clear the intersection;

- the accident involved a death and was not a "regular DWI"; and

- the uncertainty of Cole's physical condition and the valid concern that medication administered at the hospital could affect any subsequent blood sample.

The jury convicted Cole of intoxication manslaughter, found true Cole's two prior felony convictions, and assessed a life sentence.

### B. Court of Appeals

The court of appeals held that the judge erred in failing to suppress Cole's blood sample evidence.[2] The court first held that this Court's judgment in *State v. Villarreal*[3] foreclosed the State's reliance on the mandatory blood-draw provision found

1. —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013).

2. *Cole v. State,* 454 S.W.3d 89, 103 (Tex. App.—Texarkana 2014).

3. 475 S.W.3d 784 (Tex.Crim.App.2014), *reh'g denied,* 475 S.W.3d 817 (Tex.Crim.App.2015) (per curiam).

in Transportation Code § 724.012(b)(1)(A).[4] After a suspect's arrest for an alcohol-related offense, § 724.012(b)(1)(A) requires an officer to obtain the suspect's breath or blood sample when the officer reasonably believes that, as a direct result of the suspect's intoxication, someone is killed in a motor vehicle accident.[5] The court then found that the record failed to establish that an exigency existed to justify the warrantless search.[6] Specifically, the court noted that Higginbotham made no attempt to obtain a warrant even though a magistrate was available, there was no indication that another officer was not available to obtain a warrant, and the record contained no evidence of the elimination rate of methamphetamine.[7] The court held that, based on the totality of the circumstances, the State failed to satisfy its burden that an exigency existed and the warrantless seizure was justified under the Fourth Amendment.[8]

We granted the State's petition for discretionary review to evaluate these holdings.

## II.

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review.[9] First, we afford almost total deference to a trial judge's determination of historical facts. The judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony.[10] When findings of fact are not entered, we view the evidence in the light most favorable to the judge's ruling and assume the judge made implicit findings of fact that support the ruling as the record supports those findings.[11] Second, we review a judge's application of the law to the facts de novo.[12] We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case.[13]

### A. The Fourth Amendment

The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."[14] A warrantless search of a person is reasonable only if it falls within a recognized exception.[15] Intrusions into the human body implicate an individual's "most personal and deep-rooted expectations of privacy," and therefore are considered searches that fall under the Fourth Amendment's warrant requirement.[16] While there are several excep-

4. *Cole,* 454 S.W.3d at 97.

5. Tex. Transp. Code § 724.012(b)(1)(A) (West 2012).

6. *Cole,* 454 S.W.3d at 103.

7. *Id.*

8. *Id.*

9. *Turrubiate v. State,* 399 S.W.3d 147, 150 (Tex.Crim.App.2013).

10. *Valtierra v. State,* 310 S.W.3d 442, 447 (Tex.Crim.App.2010).

11. *Id.*

12. *Id.*

13. *Id.* at 447–48.

14. U.S. Const. amend. IV.

15. *Villarreal,* 475 S.W.3d at 796.

16. *McNeely,* 133 S.Ct. at 1558–59 (quoting *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)).

tions to the warrant requirement, the present case deals only with an exigency based on imminent destruction of evidence.[17] The established warrant-requirement exceptions are permitted because each is potentially reasonable and "there is a compelling need for official action and no time to secure a warrant."[18]

## B. The Fourth Amendment and Texas's Transportation Code

■ The State argues that compliance with Transportation Code § 724.012(b) does not violate the Fourth Amendment because the statute dispenses with the warrant requirement. It further maintains that a warrantless blood draw taken in compliance with the statute is reasonable based on the totality of the considerations "viewed under the aggregate framework encompassing components of consent, special needs, search incident to arrest, and exigent circumstances."[19] The State's submitted the instant brief while the State's motion for rehearing in *State v. Villarreal* was pending. That motion was ultimately denied, and the Court's opinion on original submission rejected the arguments the State presents here.[20]

## C. Exigency and Warrantless Blood Draws

■ As *Villarreal* made plain, a warrantless search is *per se* unreasonable unless it falls within a well-recognized exception to the warrant requirement.[21] Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances.[22] "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation."[23] An exigent circumstances analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search.[24]

The Supreme Court's and this Court's jurisprudence on exigency created by the imminent destruction of physical evidence stands only at the periphery of the issue presented here. "The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a 'now or never' situation."[25] The body's natural metabolism of intoxicating. substances is distinguishable from the potential destruction of easily disposable evidence when the police knock on the door.[26] Contrary to the court of appeals' conclusion, the principles animating exigency

17. *See Cupp v. Murphy*, 412 U.S. 291, 296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

18. *McNeely*, 133 S.Ct. at 1559 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)).

19. State's Brief on the Merits at 16.

20. *See generally Villarreal*, 475 S.W.3d at 800–13 (rejecting, among other arguments, that a warrantless blood draw could be reasonable under a balancing test).

21. *Id.* at 808–09 (holding that the Texas Transportation Code provisions requiring a blood draw under certain circumstances did not create a Fourth Amendment exception).

22. *McNeely*, 133 S.Ct. at 1559.

23. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

24. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

25. *McNeely*, 133 S.Ct. at 1561.

26. *Cf. Kentucky v. King*, 563 U.S. 452, 459–60, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (recognizing the warrant requirement exception to prevent the imminent destruction of evidence when law enforcement, after knocking on a suspect's door, believed drugs were being destroyed).

cases addressing physical evidence destruction does not directly answer the issue before us.[27]

Like in *Weems v. State,*[28] an opinion handed down today, we conclude this case is controlled by United States Supreme Court's precedent and language found in *Schmerber v. California*[29] and *Missouri v. McNeely.*[30] A more detailed recitation of the precedent emanating from those cases is found in the *Weems* opinion. But suffice it to say that the Supreme Court has previously found sufficient exigent circumstances, such as in *Schmerber* where the record established that the officer had probable cause to believe Schmerber was driving under the influence of alcohol and "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence."[31]

Nearly fifty years later, the Court in *McNeely* held that the natural dissipation of alcohol in the bloodstream did not create a *per se* exigency justifying an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing.[32] The *McNeely* Court held firm to the warrant requirement by stating that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[33] Yet the Court still recognized the gravity of the body's natural metabolic process and the attendant evidence destruction over time.[34] With this balance in mind, the Court adhered to a totality of the circumstances analysis with the notion that certain circumstances may permit a warrantless search of a suspect's blood. The narrow issue before the Court prohibited it from providing an exhaustive analysis of when exigency in intoxication related offenses may be found. However, the Court provided insight on the issue by identifying a few relevant circumstances that may establish exigency in this context.[35] In addition to the body's metabolization, they include "the procedures in place for obtaining a warrant,[36] 'the availability of a magistrate judge,'[37] and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence."[38]

### III.

The court of appeals' exigency analysis first suggested that, had the warrant process started when Wright received the instruction to arrest Cole and obtain his blood sample, law enforcement could have

27. *See Cole,* 454 S.W.3d at 103 (holding that this case did not "reach the 'now or never' level contemplated by exigent circumstances precedent") (citing *King,* 131 S.Ct. at 1856).

28. No. PD–0635–14, —— S.W.3d ——, 2016 WL 2997333 (Tex.Crim.App. May 25, 2016).

29. 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

30. —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013).

31. *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826.

32. *McNeely,* 133 S.Ct. at 1568.

33. *Id.* at 1561.

34. *Id.* at 1568 ("It suffices to say that the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required.").

35. *Id.* at 1568.

36. *Id.*

37. *Id.*

38. *Id.*

been able to draw Cole's blood pursuant to a warrant before 2:00 a.m.[39] This time line, the court suggests, demonstrates that an exigency did not exist. The court's analytical approach in constructing a time line containing a hypothetical warrant obtained at a particular point followed by the potential timeliness of the search's results impermissibly views law enforcement action though the lens of hindsight.[40] Through reasoned deliberation free from tense, uncertain, and rapidly evolving circumstances, there is a tempting draw for a reviewing court to pronounce what law enforcement ideally should have done in a particular case after all the facts are known. But hindsight distorts a proper exigency analysis's focus: whether officers had a reasonable belief that obtaining a warrant was impractical based on the circumstances and information known at the time of the search. This approach also overlooks the practical problems and considerations found in the record that made obtaining a warrant impractical.

The amount of time it took for Higginbotham to investigate the accident scene was the most significant obstacle law enforcement faced in obtaining a warrant for Cole's blood. The accident's severity and the block-long debris field it created necessitated Higginbotham's three-hour examination of the roadway, damaged vehicles, distances, direction the vehicles' travel, debris, vehicles' weight, vehicles' travel angles, road surface drag factors. According to Higginbotham, no one else was capable of determining the nature or cause of the accident, or who was at fault. Only after Higginbotham measured, calculated, and assessed the vehicles' damage was he able to form probable cause to believe that Cole was responsible for the accident and Hightower's death.[41]

Additionally, both the time required to complete the accident investigation and the lack of available law enforcement personnel further hindered pursuing the warrant process. Higginbotham testified that he believed it was not feasible for him to leave the accident scene and abandon the accident investigation or to wait until the accident investigation was complete before attempting to obtain a warrant. Because he was the only available officer capable of performing the accident investigation, his continued presence at the scene was vital. And without first completing the investigation, debris could not be cleared from the intersection and reopened to traffic. In Higginbotham's estimation, Officer Wright would not be able to obtain a warrant for him. After placing Cole under arrest, Wright was now responsible for his custody at the hospital and could no longer handle that responsibility while simultaneously drawing up a statement regarding her belief of Cole's intoxication.

The accident scene's location and the public-safety danger required a number of officers at the scene to perform necessary responsibilities including securing the accident scene, directing traffic, and keeping the public away from the scene. We do

---

39. *Cole,* 454 S.W.3d at 103.

40. *Ryburn v. Huff,* —— U.S. ——, 132 S.Ct. 987, 992, 181 L.Ed.2d 966 (2012) (per curiam) (instructing that "reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.and that the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.") (internal quotations omitted).

41. *See* Tex. Penal Code § 49.08 (West 2012) ("A person commits [intoxication manslaughter] if the person: (1) operates a motor vehicle ...; and (2) is intoxicated and by reason of that intoxication causes the death of another by accident or mistake.").

not disagree with the court of appeals' conclusion that "[t]here is no indication that officers not on the scene were unavailable to help obtain a warrant."[42] We do disagree, however, that an exigency finding cannot be made without the record establishing—and by extension, the State proving—that there was no other officer available to get a warrant in the lead investigator's stead. In all but the rarest instances, there will theoretically be an officer somewhere within the jurisdiction that could assist the lead investigator. Requiring such a showing in every case where exigency is argued improperly injects the courts into local law-enforcement personnel management decisions and public policing strategy. It further reduces the exigency exception to an exceedingly and inappropriately small set of facts, and would defeat a claim of exigency on the basis of a single circumstance in direct opposition to the totality-of-circumstances review *McNeely* requires. Nonetheless, the availability of other officers is a relevant consideration in an exigency analysis.

This record establishes that fourteen officers were present and who, in Higginbotham's estimation, were all performing important law enforcement or public-safety duties. Taking any one of them away, according to Higginbotham, would have left a necessary duty unfulfilled. This record further reflects that the fourteen officers at the scene made up nearly half of the minimum amount of officers the Longview Police Department requires for the entire city over two shifts. By the same estimation, the record does not establish that there was a readily available officer who could have gotten a warrant while Higginbotham continued his investigation and Wright kept Cole in custody at the hospital.

Even had Higginbotham attempted to secure a warrant from an on-call magistrate, the issuance of a warrant would have taken an hour to an hour and a half "at best." During that time, Higginbotham was reasonably concerned that both potential medical intervention performed at the hospital and the natural dissipation of methamphetamine in Cole's body would adversely affect the reliability of his blood sample. According to EMS, Cole reported having "pain all over." Higginbotham was reasonably concerned that the administration of pain medication, specifically narcotics, would affect the blood sample's integrity.

In addition to the logistical obstacles of securing a warrant, Higginbotham knew that during the hour to an hour and a half necessary to obtain a warrant Cole's body would continue to metabolize the methamphetamine and other intoxicating substances he may have ingested. The court of appeals correctly notes that the record does not contain evidence regarding the rate the body metabolizes methamphetamine.[43] But the lack of a known elimination rate of a substance law enforcement believes a suspect ingested does not necessarily mean that the body's natural metabolism of intoxicating substances is irrelevant to or cuts against the State's exigency argument. In fact, it serves to distinguish this case from *McNeely*.

The *McNeely* Court relied in significant part on the widely known fact that alcohol "naturally dissipates over time in a gradual and relatively predictable manner."[44] The lack of a known elimination rate is at odds with the undercurrent running through the *McNeely* opinion: While time

**42.** *Cole,* 454 S.W.3d at 103.

**43.** *Cole,* 454 S.W.3d at 99.

**44.** *McNeely,* 133 S.Ct. at 1561.

is of the essence, a minimally delayed test when dealing with an alcohol-related offense does not drain the test of reliability because experts can work backwards to calculate blood-alcohol content at an earlier date.[45] In this case, without a known elimination rate of methamphetamine, law enforcement faced inevitable evidence destruction without the ability to know—unlike alcohol's widely accepted elimination rate—how much evidence it was losing as time passed.

## IV.

From our review of the totality of the circumstances, we conclude that law enforcement reasonably believed that obtaining a warrant in this case would have significantly undermined the efficacy of searching Cole's blood.[46] The circumstances surrounding the taking of Cole's blood sample demonstrate that obtaining a warrant was impractical.[47] Like the officer in *Schmerber*, law enforcement was confronted with not only the natural destruction of evidence through natural dissipation of intoxicating substances, but also with the logistical and practical constraints posed by a severe accident involving a death and the attendant duties this accident demanded.[48] We therefore conclude that exigent circumstances justified Cole's warrantless blood draw.

The court of appeals' judgment is reversed, and the case is remanded to the court of appeals to address Cole's remaining issue on appeal.

Johnson, J., filed a dissenting opinion. Yeary, J., concurred.

Johnson, J., filed a dissenting opinion.

The issue on appeal is whether a warrant was required before the state could obtain a blood draw from appellant without his consent. At issue is whether sufficient exigent circumstances existed such that the state may rely on Section 724.012(b) of the Transportation Code, "Taking of Specimen," to relieve it of the constitutional requirement to obtain a search warrant before obtaining a blood sample without consent. I would hold that the circumstances and testimony at trial indicate that a warrant was required.

The court of appeals noted that

[T]he State argues that the blood draw was reasonable and/or consensual under the mandatory blood-draw provisions of Section 724.012(b)(1)(A) of the Transportation Code, which, in the absence of consent, requires officers to obtain samples of breath or blood when someone is killed in a motor vehicle accident and the officer has reasonable grounds to believe the person was operating a motor vehicle while intoxicated. Here, there is no dispute that the officers on the scene had reasonable grounds to believe that Cole was driving while intoxicated, that Cole refused to consent to having his blood drawn, and that a death resulted from the collision.

*Cole v. State,* 454 S.W.3d 89, 97 (Tex. App.—Texarkana 2014).

The court of appeals then cited this Court's decision in *State v. Villarreal,* which held that the provisions in the Transportation Code—the implied consent law and the mandatory blood draw law— by themselves, do not form a constitutionally valid alternative to the Fourth Amend-

45. *See id.* at 1560–61, 1563.

46. *Id.* at 1561.

47. *Id.*

48. *See Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826. *See also McNeely,* 133 S.Ct. at 1559– 60.

ment warrant requirement. *State v. Villarreal,* 475 S.W.3d 784 (Tex. Crim. App. 2014). *See also Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) (A search "without prior judicial evaluation" may be reasonable "[w]here there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime.").

An individual had died. Appellant was under arrest, had admitted use of methamphetamine, and had refused to consent to the taking of a blood sample. The question is thus narrowed to whether sufficient exigent circumstances existed to excuse the lack of a search warrant.

> "A defendant who alleges a Fourth Amendment violation has the burden of producing evidence that rebuts the presumption of proper police conduct. He may carry this burden by establishing that the seizure occurred without a warrant." ... The burden then shifts to the State to prove that the seizure was nonetheless reasonable.... Here, there is no dispute that Cole's blood was taken without a warrant, and the record establishes that Cole would not consent to having his blood drawn. Therefore, the State bore the burden of proving that the seizure was reasonable.

*Cole v. State,* 454 S.W.3d at 96 (citations omitted).

The statute states that

> (b) A peace officer shall require the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft and the person refuses the officer's request to submit to the taking of a specimen voluntarily:
>
> (1) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result of the accident:
>
>> (A) any individual has died or will die;
>>
>> (B) an individual other than the person has suffered serious bodily injury; or
>>
>> (C) an individual other than the person has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment; ....

The state presented fourteen witnesses—the lead investigator, and five persons who had contact with appellant on the night of the collision.[1] Officer Castillo was first on the scene, at about 10:23 p.m. His only contact with appellant was to help to remove appellant from appellant's vehicle. EMT Steelman treated appellant at the scene and transported him to the hospital. Officer Wright sat with appellant waiting for EMS to arrive, then followed EMS as it transported appellant to the hospital, arriving at the hospital at 10:38 p.m. Both Steelman and Wright heard appellant admit to having ingested methamphetamine. Two nurses who were on duty in the hospital emergency room testified; one drew the blood sample at the direction of Officer Wright, the other testified about proce-

---

1. The other eight witnesses were three civilians who saw the wreck happen (Colby Lewis, George Diaz, and Joshua Diaz), appellant's employer, the forensic photographer, an officer from the Kilgore College Police Department, the laboratory technician who analyzed appellant's blood sample, and the medical examiner who performed the autopsy on the victim.

dures for drawing blood. Officer Higginbotham, the lead investigator, testified at length about the measurements and calculations he had performed in order to determine how the wreck happened.

Officer Castillo testified that he was on patrol when, at about 10:23 p.m., he heard a loud noise and saw smoke. He went to investigate.

> Once I got to the intersection, I was closer, I saw it. It was actually a pickup, a vehicle on fire. Fire was coming out from underneath the—the pickup, the driver's area, and all around.... I get out of the patrol car. I was able to see that there was somebody in the driver's seat, or the person's hands were up. I wasn't sure if this person was dead, alive, or anything. I had a—all carry a fire extinguisher in the trunk of our patrol car. I exited real quick. Went to the trunk of the patrol car, got a fire extinguisher. By that time, the—the fire was just large in size already. And I knew there wasn't anything I could do for that person inside or put out that vehicle fire, because the fire was just way too big by then.

III R.R. 24, 28.

Officer Castillo's testimony makes clear that, from the very first, it was known that there had been a collision with a fatality.[2]

Officer Wright responded to the scene after hearing a call from Officer Castillo for officers with fire extinguishers. She testified that she sat with appellant until EMS arrived, then followed the emergency vehicle to the hospital. She maintained contact with her sergeant both at the scene and at the hospital. Before she left the scene, she had informed her sergeant of what she had heard from appellant.

Q. ... Prior to being placed in custody, he's talking to the medic. Did you hear him say anything to the medic?

A. Yes, ma'am, I did. The medics asked if he had had anything to drink. He stated no, that he doesn't drink. They asked if he had taken anything. He stated, "Maybe." And at that time they asked, "Well, what had you taken?" And he said, "Some meth."

. . .

Q. Now, the whole time you're—you're at the hospital,—

A. Yes, ma'am

Q. —you're the transport officer at the hospital—you're not on scene,—

A. No, ma'am.

Q. —not be able—you're not able to be on scene. Are you in contact with officers on scene during this entire time?

A. Yes, ma'am.

Q. And before you left the scene, you were—you were aware that there was a death?

. . .

A. Absolutely, yes, ma'am.

Q. And after you observed the defendant's behavior and after you heard his—what he said about taking meth to the EMS, did you relay this information

A. That's correct.

III R.R. 36–37.

On the other hand, Colby Lewis, a civilian who saw the collision, stated, "Of course, it was later at night, so there wasn't very many vehicles on the road." III R.R. 46.

---

2. On one point, Officer Castillo's testimony is inconsistent with that of one of the civilians who saw the collision. During questioning by the state, Officer Castillo agreed that there was considerable activity.

> Q. Now, South and High Street we saw, as you approached that intersection, even at 10:30 at night, there's still lots of activity and lots of traffic in that area; is that right?

back to the sergeant or the officer that was in charge of the scene?

A. Yes, ma'am. Because they—they aren't there to observe it either, and—and that's information that they need to know.

Q. What happened—how—about how long were you at the hospital, if you had to estimate, before you received the okay that—well, how long were you at the scene at the hospital?

MS. HOOD: Strike that last part.

A. I got to the hospital at about 10:38 p.m., and I think I left there—it looks like I left at 1:47 in the morning.

Q. And at any time did the officers on scene tell you to try and get a blood sample from—

A. Yes. They asked me to go ahead and read what's called the DIC–24 form. It's a statutory warning, and it's the form that we use to request blood samples or a breath specimen.

III R.R. 233, 235–36.

Clearly, by 10:38 p.m., appellant was being treated at the hospital, and the officers at the scene knew about both the fatality and appellant's use of methamphetamine.

Officer Higginbotham testified that he was the traffic investigator on call.[3] He got a call to return to duty at about 10:30 p.m. because there had been a collision with a fatality. He estimated that it took 30 minutes for him to reach the scene. He conceded that there were magistrates on call.

Q. And back during that time, did you—were you aware of the fact that there were judges available to take a blood warrant to?

A. We do have a—we have a rotation of judges that are on call, yes, sir.

III R.R. 190.

Officer Higginbotham named fourteen other officers at the scene, yet not one of fifteen officers contacted the magistrate on call to ask for a warrant. When questioned about how many officers he needed, Higginbotham answered that four or five officers to block east-west traffic and at most six officers to block north-south traffic, plus Officer Wright at the hospital and two shift supervisors. III R.R. 193–94. This left at least two officers free. Still, no one attempted to get a warrant. No one even discussed getting one.

Higginbotham conceded that, on occasion, in the middle of a traffic-accident investigation, he had taken time out of working the accident to obtain a warrant. And although he knew that there was a rotation of judges "on call" and available at any time of for purposes of issuing a warrant, at no time during his investigation did he discuss with any other police personnel the possibility of getting a warrant to draw Cole's blood. III R.R. 190–91.

Officer Higginbotham also seemed to be of the opinion that only he or Officer Wright could swear out an affidavit.

Q. Let's just say in this case, that instead of you relying on the statute, you instead decided to get a search warrant for the blood draw. What would you have done?

A. I would have had to—either Officer Wright and I, or I, both of us, would have had to give some sort of statement; take time out of what we were doing to draw up our probable cause, what we observed and why we believed that Mr. Cole was intoxicated at the time.

3. Much of Officer Higginbotham's testimony consisted of the state asking leading questions that stated the state's version of events, to which Detective Higginbotham would reply, "That's correct."

Q. Okay.

A. We have to draw that up and then, of course, same procedure; send it to a judge, get the judge to sign it, send it back to us.

III R.R. 189–90.

The statute says:

(b) A peace officer shall require the taking of a specimen of the person's breath or blood ... if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle ... and the person refuses the officer's request to submit to the taking of a specimen voluntarily:

· (1) the person was the operator of a motor vehicle ... involved in an accident that the officer reasonably believes occurred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result of the accident:

. (A) any individual has died or will die; . . . .

Officer Higginbotham knew before he left home that there had been a fatality. He was in contact with officers at the scene before and after his arrival at about 11:00 p.m. The officers already · at the scene knew that appellant was under arrest and had admitted ingesting two hits of methamphetamine and that the victim had died. Three witnesses to the collision had informed the officers that the victim had been moving slowly and that appellant had been traveling at a high rate of speed when he collided with the victim and totaled both large trucks.[4] With that information, any officer at the scene could "reasonably believe" that appellant was at fault. It does not take complex calculations about friction, speed, weight, and inertia to

place blame on appellant for the purpose of getting a warrant.

Officer Higginbotham also testified about the procedure for getting a warrant.

Q. So when you got someone arrested for DWI, you're going to do a blood draw, do you actually leave that person with somebody else and go get the warrant, or do you have somebody else draft it up? How's that work?

A. Usually we leave that subject with another officer.

Q. Okay. And then go get the warrant?

A. Yes, sir.

III R.R. 194.

But, apparently unusually, no one relieved Officer Wright so that she could go get a warrant.

Higginbotham also testified about the time to get a warrant.

Q. Okay. So how long would it have taken to procure a search warrant, based on your knowledge and experience,—

A. Yes, sir.

Q. —here in Gregg County?

A. Yes, sir. About an hour to an hour and a half at the best. That's—ones that we've done previous, that's about what it takes.

III R.R. 191–92.

He knew before he reached the scene, as did numerous other officers, that a blood sample was desirable. If he had begun the process when he was called at 10:30 p.m., or even when he arrived at about 11:00 p.m., he could have had the warrant in hand by about 12:00 a.m. or 12:30 a.m. Officer Wright could have asked for a warrant at any time after 10:38 p.m. when she

---

4. The vehicles were appellant's Ford F–250 diesel, estimated to weigh 6,000 4 pounds, and the victim's Toyota Tundra, estimated to weigh 4,200 pounds. III R.R. 139.

arrested him at the hospital.[5] There were two shift supervisors on scene; either could have requested a warrant. No one even discussed the issue.

The court of appeals noted that it reportedly took about 40 minutes from the time that Officer Wright arrested appellant at the time noted on the DIC–24, 11:38 p.m., before taking a blood sample at 12:20 a.m. Assuming, as did the court of appeals, that such a delay would also have occurred with a warrant, the blood could have been properly drawn between 11:40 p.m. and 12:10 p.m., 10–50 minutes before it actually was drawn without a warrant. Even assuming a request at 11:38 p.m., the sample could have been drawn at about 1:00 a.m., only 40 minutes after the actual draw.

One of Officer Higginbotham's expressed concerns was that appellant was metabolizing whatever he had ingested, yet, as the court of appeals noted, "Here, while Higginbotham testified that Cole's body was metabolizing the methamphetamine in his system, there is no evidence whatsoever of the dissipation rate for methamphetamine levels in a person's blood." *Cole* at 102; *see also Missouri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 1561, 185 L.Ed.2d 696 (2013). The court of appeals also noted in a footnote that, when the expert witness was asked how quickly the body absorbs methamphetamine, he stated that "it depended on the manner in which the drug was administered—the slowest is by mouth, faster routes include snorting and smoking, and the fastest is intravenous injection." *Cole* at 102, n.8. But no evidence of how the drug was used was presented,[6] even though, according to the United States Supreme Court's decision in *McNeely*, the dissipation rate was "essential" in determining whether exigent circumstances existed. *Cole* at 102. Without such information, it is difficult to posit that this was a "now or never" situation. *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) (A search "without prior judicial evaluation" may be reasonable "[w]here there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime.").[7]

I agree with the court of appeals that this was not a "now or never" situation that would relieve the state of its burden. I would affirm its judgment. Because the Court does not do so, I dissent.

---

**5.** State's exhibit 9, the DIC–24, states that appellant was arrested at 11:38 p.m. However, he had been under the watchful eye of Officer Wright at the scene from about 10:30 p.m. and after 10:38 p.m. at the hospital. Given the facts, I conclude that he was under arrest no later than 10:38 p.m, as he clearly would not have been allowed to leave the hospital. State's exhibit 10, the authorization for the blood draw, contains 12:20 a.m. as the time of the draw.

**6.** The biggest concern in the State's argument is the dissipation of 6 the drug levels in Cole's blood during the time the "officers were investigating the scene, controlling traffic, documenting evidence, interviewing witnesses

before anybody could get back to the office and seek a warrant." While such dissipation should be a concern, the state presented no evidence regarding the rate at which methamphetamine is metabolized by the body or the rate at which it dissipates. *Id.* at 98–99.

**7.** The trial court found six exigent circumstances that justified the warrantless blood draw, five of which were based on the severity of the collision. *Cole* at 98. Only one concerned the need to get a blood sample in a timely fashion: Cole's health and safety, and concern that the hospital could give him additional medications.