**AFFIRMED and Opinion Filed November 4, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-01267-CR

**DEAN ALAN MATTHEWS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 207th District Court**
**Comal County, Texas**
**Trial Court Cause No. CR2016-544**

# MEMORANDUM OPINION

Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Reichek

Following the denial of a motion to suppress evidence obtained by a warrantless blood draw, Dean Alan Matthews pleaded guilty to three felony offenses in connection with a car accident in which a woman was killed. *See* TEX. PENAL CODE ANN. §§ 49.08 (intoxication manslaughter), 19.04 (manslaughter); TEX. TRANSP. CODE ANN. § 550.021 (accident involving death). A jury found appellant guilty, made an affirmative deadly weapon finding, and assessed punishment at twenty years in prison on each charge. In addition, it assessed a $10,000 fine in both manslaughter cases. In a single issue on appeal, appellant contends the trial court erred by denying his motion to suppress. For reasons set out below, we overrule his issue and affirm the trial court's judgments.

FACTUAL BACKGROUND

Eighteen-year-old Brianna Rodriguez was killed in a fiery crash on FM 306 in Comal County sometime after midnight on Saturday night of Labor Day Weekend 2015. Department of Public Safety troopers and Comal County sheriff's deputies responded to the scene in which multiple cars were involved. Officers described the scene as chaotic, with people and cars everywhere. A concert at a nearby venue had just let out, and the line of vehicles on FM 306 numbered into the hundreds. The crash scene itself extended a quarter of a mile.

During the investigation, appellant was identified as the person who caused the accident. While the accident scene was being investigated, a DPS trooper was sent to the Bexar County hospital where appellant was transported, to obtain a blood sample. When the trooper arrived at the hospital emergency room about three hours after the accident, appellant was not conscious and the trooper obtained a warrantless blood draw.

A grand jury subsequently returned a three-count indictment against appellant charging him with Rodriguez's death. Before trial, appellant sought to suppress the results of the warrantless blood draw as violative of the Fourth Amendment. At a pretrial hearing, the State relied on exigent circumstances to justify the blood draw and presented the testimony of several law enforcement officers who worked at the scene of the accident.

DPS Trooper Kurt McWhinney led the investigation. He testified he was working patrol in Comal County that night when a motorist told him about the crash. When McWhinney arrived at the scene, he saw three vehicles "stuck together." One of the vehicles was engulfed in flames and another was partially on fire. A crowd of people had gathered, and people told McWhinney that someone was still in the car engulfed in flames. The fire began to grow and pop, and officers had to move bystanders and vehicles away from the area. The traffic in the area was heavy, and McWhinney estimated there were hundreds of cars with people standing outside them.

A witness approached McWhinney and told him the "driver," or appellant, was trying to "escape"[1] and she had grabbed him and told him he could not leave. McWhinney asked how she knew he was the driver, and the woman said "someone told" her. McWhinney found appellant bent over a fence. He smelled strongly of alcohol and had glassy, bloodshot eyes and extremely slurred speech. McWhinney moved appellant away from the fire and tried to ask him questions, including whether he was one of the drivers, but appellant did not respond except to continuously yell "Jason." He noticed appellant had minor injuries and told him to sit down in the ditch. McWhinney left briefly to move his vehicle away from the fire and when he returned to talk with appellant, appellant was asleep and snoring. Emergency medical services arrived and transported appellant to a San Antonio hospital in Bexar County. McWhinney said he suspected appellant was intoxicated, but he was not able to have appellant perform field sobriety tests. Although McWhinney was concerned about medications that appellant could be given by EMS, he said he could not interfere in that process.

Over the next two hours, McWhinney interviewed several witnesses while two other troopers, Joshua Lee Walter and Sgt. Tom Lambert, took photographs and marked the scene, tasks that McWhinney said were necessary to preserve evidence in the case. When he finished talking to all the witnesses, McWhinney walked the scene with Walters and Lambert and waited for the coroner and tow trucks. Once tow trucks removed the vehicles from the scene, more photographs were taken and markings made. McWhinney said he cleared the scene between 5 and 6 a.m., some five hours after the crash occurred. During the investigation at the scene, Comal County sheriff's deputies handled traffic, closing down FM 306 and diverting vehicles to prevent them from coming through the crash site and destroying evidence or creating safety risks. McWhinney said it was

---

[1] The witness actually told McWhinney that the "driver of the truck" was trying to escape; the record is clear that appellant was the driver of the truck.

important that the deputies direct traffic because FM 306 was a very dangerous road, with many hills and curves.

McWhinney described his initial review of the crash as "confusing." At first, people he talked to identified the wrong car as causing the crash. It was also a "difficult scene" because it was "spread out" and involved a fatality. Also, he learned there was a second crash site about one hundred yards up the road. Eventually, he determined that appellant, traveling north on FM 306 in a truck, sideswiped three southbound vehicles. Appellant continued driving north before crossing into the oncoming traffic lane and striking Rodriguez's Ford Fusion. The collision spun Rodriguez's vehicle around and sent it traveling north in the southbound lane, causing it to crash head-on with a BMW traveling south. The Ford Fusion became engulfed in flames. A passenger in the vehicle escaped, but Rodriguez died. McWhinney said that having a fatality involved "change[d] everything," including the nature of the investigation. He knew there would be charges filed and he needed to make sure he had "evidence for court."

McWhinney estimated he had probable cause to believe appellant was the driver of the truck who caused the accident about two hours into his investigation. He said it took that long to locate a witness who either saw appellant driving the truck or getting out of the truck. Once he had probable cause, he did not attempt to contact a judge. He explained that while he was investigating the scene, he could not stop what he was doing to draft an affidavit for a search warrant, find a judge, and get it signed. Although he acknowledged that he had a computer in his car from which he could have drafted the affidavit, there was no one else that could have spoken to the witnesses while he performed that task and there was no one to take over for the troopers who were photographing and marking the scene. Even if he had been able to stop what he was doing, McWhinney said it would have taken him forty-five minutes just to draft the affidavit and then he would have needed to find a printer so that he could sign and notarize the affidavit. After

–4–

that, he said, he would have needed to find a judge after 2 a.m. on a holiday weekend. McWhinney testified that although they had a "list of judges" that they could call, they did not have a "certain one" on duty that night that was "just waiting by the phone for us." So, he said, he would have needed to find a judge, who heard his phone ringing in the middle of the night, and was "willing to drive to wherever" McWhinney was to review the warrant and sign it.

McWhinney further explained that, in the past, he had used the same judge for DWIs, and, in the best-case scenario, the judge would arrive at the local hospital within fifteen to twenty minutes, if he answered the phone. In a worst-case scenario, it has taken more than hour. And, he said, he has had circumstances where no judge answered the phone. Here, there was an added delay because appellant was taken to a San Antonio hospital, which was an hour away.[2] While he could have given the information for the affidavit to another officer, assuming one was available, it would not have been for at least two hours. As he explained, the law enforcement officers at the crash site were all busy and no one was "just standing around doing nothing."

McWhinney testified he knew that Sgt. Lambert had contacted another trooper, Richard Alvarez, who was in New Braunfels, to go to the San Antonio hospital and obtain a blood draw from appellant, but he did not contact Alvarez to give him the information to obtain a search warrant. He said if he had contacted Alvarez with the information, he would have needed to explain the facts and would have wanted to review the affidavit after Alvarez drafted it, and he simply did not have the time. Also, he explained, Alvarez was at the hospital in San Antonio, and McWhinney did not know the judges there or their process, so it would have taken additional time to figure that out. Finally, McWhinney said if he had waited the two to three hours until his investigation was over to begin the process of obtaining a warrant, the blood-alcohol evidence

---

[2] Moreover, McWhinney said he needed a district judge, not county judge, to sign the warrant. *See Sanchez v. State*, 365 S.W.3d 681, 685–86 (Tex. Crim. App. 2012) (concluding statutory county court judges lack authority to issue a search warrant to be executed outside of their own county).

would have been greatly affected because appellant was "metabolizing" the alcohol and they were losing evidence.

Trooper Walter testified he was investigating another crash in which a driver was pinned in a burning vehicle when he got the call to respond to this accident. When he arrived on scene, he said there was a long line of cars, "too many to count," stopped in traffic and "tons of people out there." At the actual crash scene, he saw three vehicles, two of which had burned. Down the road, he saw more vehicles that had been involved. Walter said it was a "huge crash scene, a lot of people there, and very chaotic."

For about two hours, Walter took photographs and helped mark the scene. He said it was important to do both tasks as quickly as possible because he did not want to miss any evidence "that could go away." After photographing and marking the scene, he took an inventory of one or two of the involved vehicles and waited for the wrecker. Once the vehicles were towed, additional photographs were taken to get a "different perspective." He said he finished at about 5 a.m. and went home.

Walter said he could not have obtained a search warrant because he had only basic information about the crash and knew none of the details. If he had had the facts, however, based on his experience with the warrant process and procedures in Comal County, he estimated it would have taken two to three hours to draft a warrant and get it signed. He explained that in this case, appellant was taken to a hospital outside Comal County, which required a district judge to sign the warrant. The only district judge he knew in Comal County did not have a fax machine, so Walter would have had to drive the judge's house or to have met him somewhere to get the warrant signed. From there, he would have had to get the warrant to Trooper Alvarez in Bexar County.

Walter agreed that in an accident investigation, multiple tasks need to be done and there is no "time limit" on completing the investigation. He did not agree, however, that the taking of

witness statements and photographs and marking the scene should be put off to get a warrant. Rather, he testified that the investigation needed to be worked properly. He did not see any officers at the scene "just standing around." To the contrary, he said, "[e]verybody was doing something," and he knew of no one that was available to draft a search warrant.

Sgt. Lambert testified that he arrived at the crash site about an hour after he was notified and, like Walter, described it as a "pretty chaotic, crowded scene." He explained that FM 306 is a dangerous road to work an accident investigation because of the heavy traffic, and on top of that, this was a holiday weekend, which meant there were "lots of cars and lots of drinking."

Soon after arriving, Lambert contacted Trooper Alvarez to go to the hospital to get blood because he believed the driver that caused the crash was intoxicated. Lambert said he did not have probable cause at that time but McWhinney "would have." He then spent the next two hours marking the scene. Lambert, who had investigated hundreds of accidents over his career, explained that it was important to secure the scene to gather evidence, and it had to be done quickly so the evidence is not altered or tampered with by people walking though the scene.

Lambert said he could not have drafted the search warrant affidavit because he did not have the requisite facts, which could cause later issues in court. Even if he had the necessary information, Lambert estimated it would have taken two to three hours to obtain a search warrant in this case once the investigation was complete. He also said there were no available officers that night to compile information from anyone to draft a search warrant. Every law enforcement officer at the scene had a function to perform. He said there were not any other available troopers to help patrol the county during this time, and the first time another trooper was able to leave the accident scene was after the roadway was cleared and traffic allowed to flow again.

Lambert acknowledged there were no time limits to the investigation and they could have taken as long as needed, suggesting they could have stopped long enough to draft a search warrant.

–7–

But, he explained, FM 306 is a major thoroughfare and was blocked, and people lived and worked along that road, so there was an urgency to safely and thoroughly completing the investigation.

Trooper Alvarez testified he received a call from Lambert and arrived at the hospital in San Antonio about an hour and a half later. He said it took another twenty minutes before he had clearance to get into the emergency room to see appellant, which ultimately was about three hours after the crash. Appellant was unconscious and had monitors hooked up to his chest and a tube coming out of this mouth. Alvarez said he appeared injured but he could smell a "strong odor of alcohol." He had planned to ask for appellant's consent to a blood draw, but since he was unconscious, Alvarez relied on "implied consent." Alvarez, who had worked for DPS for twenty-four years and had performed more than 500 DWI investigations in his career, said he wanted to obtain the blood sample quickly because the evidence was "being slowly destroyed" as appellant's body metabolized the alcohol. He was also concerned that appellant was going to be given medication or an IV that might affect the alcohol concentration in his body. He said that one of the nurses was preparing to "wheel him off" for an MRI, which meant that appellant would then be out of Alvarez's sight.

Alvarez said he did not have any details of the accident, so he could not draft a search warrant affidavit. Even if he did have the facts, he was at a "big disadvantage" that night. Although he had a computer in his car, he did not have a printer or the software for the search warrant, which would have required him to start from scratch. In the best of circumstances, he said it would take an hour to draft a search warrant. Once he had it drafted, he said he could have tried to find help at the hospital to get the search warrant printed, but then he did not know how to find a judge in San Antonio to sign it. He estimated the process would have taken two to three hours, which was in addition to the almost three hours that had already passed at that point, and during this time, appellant's alcohol level was decreasing. On cross-examination Alvarez

acknowledged that there is a list of judges who make themselves available in Comal County to issue warrants if one is requested by a trooper, but again, Alvarez noted that he was in a different county at the time. The lab submission form shows that appellant's blood was collected at 4:30 a.m.

Comal County sheriff's deputies, who assisted with traffic that night, also testified. Similar to the troopers' testimony, the deputies described the accident scene and numbers of cars backed up in both directions on FM 306. Patrol Sgt. Eric Lehr testified the sheriff's office was operating at minimum mandates that night, meaning that if a deputy called in sick, they would have needed to call someone in to fill the position. Lehr arrived at the scene at about 12:30 a.m., and DPS arrived about five minutes later. Numerous cars had stopped after the initial crash, and once the fire ignited and continued to expand, Lehr said he needed to get the vehicles and people away before other cars became involved. He estimated there were twenty to thirty people standing outside their vehicles. As soon as he realized CR 306 was impassable in either direction, he completely shut down the road and had a two-person unit working each end of the accident to keep motorists away. He also knew that emergency vehicles would need access and the AIRLIFE helicopter would need to land on the road.

He and Deputy Marcus Solis worked traffic at one end of the accident, and Corporal John Montanez and Deputy Chris Parra worked the other end. Hundreds of vehicles were backed up. They went to each vehicle, talked to the driver, explained the alternative routes, and gave directions. In the process, they encountered people who had fallen asleep in their vehicles and others who were intoxicated. In the latter cases, they had to make sure the driver got someone else to come out to drive them home. They finally cleared the area of vehicles by about 3 a.m., but the road remained closed and they continued to stop and re-route vehicles.

Lehr left the accident scene shortly before 6 a.m. There was no point at which he believed he could have stopped what he was doing to draft a search warrant. Even if he had a break, he said he did not have the requisite facts. As he explained, the deputies did not have an active role in the investigation; they were assisting with traffic. If he had the facts, however, Lehr said the earliest he could have begun working on a warrant was 4:30 or 5 a.m. His vehicle had a computer, so he had the capability to draft it, but he could not scan it or email it, and there was no way to sign and notarize the document. He said he usually went to the hospital or sheriff's office to prepare a warrant, but in this case, the suspect was in San Antonio.

Like Lehr, Deputies Solis and Parra and Cpl. Montanez said that once they cleared the backup of vehicles, they could not draft a search warrant because (1) they were still dealing with traffic and (2) they had no details of the accident. Solis said that if he had all the facts, it would have taken four to five hours to obtain a warrant, given that the suspect was transported to a San Antonio hospital. Montanez estimated it would have taken two to three hours.

After hearing the evidence, the trial court orally denied the motion to suppress, stating there were "multiple exigencies" at play that night.

STANDARD OF REVIEW

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016). First, we afford almost total deference to a trial judge's determination of historical facts. The judge is the sole trier of fact and judge of witnesses' credibility and weight to be given their testimony. *Id*. When findings of fact are not entered, as is the case here, we view the evidence in the light most favorable to the judge's ruling and assume the judge made implicit findings of fact that support its ruling as long as those findings are supported by the record. *See id*. Second, we review a judge's application of the law

to the facts de novo. *Id*. We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case. *Id*.

The Fourth Amendment to the United States Constitution secures "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. Searches conducted without a warrant are per se unreasonable under the Fourth Amendment unless they are subject to an exception. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). The drawing of a person's blood is considered a search and seizure under the Fourth Amendment. *See Schmerber v. California*, 384 U.S. 757, 769–70 (1966). Consequently, a blood draw generally requires a search warrant unless a "recognized exception" to the warrant requirement applies. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *Cole*, 490 S.W.3d at 922.

The exception at issue here deals with an exigency based on imminent destruction of evidence. *Cole*, 490 S.W.3d at 923. For intoxication-related offenses, the evidence that is at risk of destruction is a suspect's blood-alcohol content, which "begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Schmerber*, 384 U.S. at 770. Consequently, in *Schmerber*, a DWI case, the Supreme Court determined that the warrantless collection of blood from a suspect does not violate the Fourth Amendment in cases when the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Id*. The *Schmerber* court ultimately concluded that there were exigent circumstances sufficient to justify a warrantless blood draw "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident." *Id*. at 770–71.

Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of the circumstances. *McNeely*, 569 U.S. at 149; *Cole*, 490 S.W.3d at 923. An exigent circumstances analysis requires an objective evaluation

–11–

of the facts reasonably available to the officer at the time of the search. *Cole*, 490 S.W.3d at 923. In addition to the body's metabolization, those facts include the procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence. *McNeely*, 569 U.S. at 164; *Cole*, 490 S.W.3d at 923. When the circumstances include an automobile accident, additional considerations include the time required to complete the accident investigation, the lack of available law enforcement personnel to assist in the investigation, the accident's severity, and the "potential medical intervention," if any, that the circumstances require. *Cole*, 490 S.W.3d at 925–27.

Here, appellant argues no exigent circumstances existed. He argues (1) that Lambert sent a trooper to the hospital to obtain appellant's blood sample before the accident investigation was over, (2) there was "normally a judge on call twenty-four hours a day" in Comal County to consider requests for blood draw search warrants, and the judge could normally be reached by phone or other electronic means, (3) McWhinney had a laptop computer in his patrol car from which he could have drafted a probable cause affidavit for a search warrant, and (4) there were multiple DPS troopers at the scene "who were qualified to participate in the accident investigation" and these same officers were not needed to secure the accident scene. In sum, he argues there was no "practical reason" as to why McWhinney could not have contacted a judge to secure a warrant.

Appellant's argument, however, ignores much of the evidence. This was an accident involving a fatality and injuries, including injuries to appellant. When officers arrived on the scene, at least one vehicle was fully engulfed in flames and was occupied by the driver. The accident scene stretched for a quarter of a mile, involved multiple vehicles, and caused a traffic backup of hundreds of cars on a heavily traveled road. Law enforcement described it as "chaotic." Sheriff's deputies, who were operating at minimum personnel mandates that night, took on the

role of clearing the traffic backup and then preventing other vehicles from attempting to pass through the debris field. In that time-consuming process, they had to speak to the drivers of the vehicles caught in the traffic jam and re-route them. They found drivers asleep as well as intoxicated persons, situations they handled while the DPS troopers investigated the crash scene.

While deputies handled traffic, DPS troopers, led by McWhinney, investigated the scene. That required talking to the various witnesses at two different crash sites and photographing and marking the scene. It was important to perform these tasks quickly, so that evidence could be preserved and remain untainted. McWhinney testified he was in the charge of the investigation and could not stop to draft a search warrant, nor could he stop to relay that information to a third party for them to draft a search warrant. The other officers all testified they did not know the details of the crash necessary for a probable cause affidavit, nor could they have delayed their tasks to do so, even if they had the information. At best, the officers indicated that it was several hours before anyone could have obtained a search warrant, which would have impacted the blood-alcohol evidence. Every officer at the scene was performing an important task necessary to the investigation or safety at the scene, and none of them could be pulled away to assist with a warrant.

It is true that several officers had the equipment necessary to draft the affidavit, but they also indicated problems they would have had printing the affidavit and warrant and getting the actual signature on the warrant. Although appellant asserts that a judge in Comal County was "normally" on call to consider blood draw warrants, the evidence showed that on this night there was no such particular judge. Additionally, appellant had been transported to a hospital in a different county which presented different problems in obtaining a warrant. The law enforcement officers all testified that if they had the information and the time, it would have taken no less than two hours to obtain a warrant once there was probable cause, during which, the evidence, showed appellant's body was metabolizing the alcohol causing valuable evidence to be lost.

Finally, by the time Trooper Alvarez drove from New Braunfels to the San Antonio hospital, it had been at least three hours since the crash occurred. Appellant was not conscious, and medical personnel were about to lead him to an MRI. Alvarez testified appellant would be out of his sight and he was concerned as to what medical interventions could be taken that might taint the blood evidence. He explained that it would have taken hours for him to obtain a warrant at that point.

The facts of this case are at least as compelling as those in *Cole*, an intoxication manslaughter case in which the court of criminal appeals concluded that exigent circumstances justified foregoing a warrant for a blood test. *Cole*, 490 S.W.3d at 927. In *Cole*, the defendant was driving a large pickup truck at 110 mph down a city street, ran a red light at a busy intersection, and collided with another vehicle, causing an explosion and instantly killing the driver of the other vehicle. *Cole*, 490 S.W.3d at 919–20. Officers were able to remove Cole from his truck. In an interview at the scene, Cole told one of the officers that he had taken "some meth" before the crash. *Id*. at 920. Cole was transported by EMS to a hospital, where his blood was drawn without a warrant approximately two hours after the collision. *Id*. at 921.

At the time of the collision, there was "considerable activity and traffic" in the area of the accident and multiple officers were needed at the scene to secure the area and keep people away for their own safety. Additionally, the fire and its continued explosions required blocking off several major intersections around the area. *Id*. at 920. A shift change complicated the manpower needed to secure the area. *Id*. The lead investigator spent about three hours investigating the scene, which was not cleaned up and cleared until 6 the next morning. *Id*.

In making its analysis, the court recounted the "practical problems and considerations" involved in the case that made obtaining a warrant impractical. Those circumstances included (1) the time required to complete the accident investigation, (2) the severity of the accident, (3) the

fact that the lead investigator officer "was the only available officer capable of performing the accident investigation," and "his continued presence at the scene was vital," (4) the accident scene's location and the public-safety danger, which required a number of officers at the scene to perform necessary responsibilities including securing the accident scene, directing traffic, and keeping the public away from the scene, (5) the fact that taking any one of these officers away would have "left a necessary duty unfulfilled," and (6) the lack of "a readily available officer who could have gotten a warrant while [the lead investigator] continued his investigation." Moreover, the court noted that if the lead investigator had attempted to secure a warrant, it would have taken an hour and a half "at best," and the officer was reasonably concerned that potential medical intervention and natural dissipation of the drug would adversely affect the reliability of the blood sample. *Id*. at 925–26.

Based on a review of the totality of the circumstances, the court of criminal appeals concluded that obtaining a warrant was impractical, given the natural destruction of evidence through natural dissipation of intoxicating substances and the logistical and practical constraints posed by a severe accident involving a death and the attendant duties that the accident required. *Id*. at 927.

Likewise, for the same reasons set out in *Cole* and based on the facts set out previously, we conclude the totality of the circumstances here support an implied finding that it was impractical for officers to obtain a warrant for appellant's blood and that the "exigencies of the situation" made the needs of law enforcement so compelling that a warrantless search was objectively reasonable under the Fourth Amendment. *See McNeely*, 569 U.S. at 142. Accordingly,

the trial court did not err in denying appellant's motion to suppress evidence.[3] We overrule the sole issue.

We affirm the trial court's judgments.

                                                    /Amanda L. Reichek/
                                                    AMANDA L. REICHEK
                                                    JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
181267F.U05

---

[3] Since the briefing of this case, the United States Supreme Court issued its opinion in *Mitchell v. Wisconsin*, 139 S. Ct. 2525 (2019). There, a plurality of the court concluded that when a driver is unconscious or in a stupor and unable to take a breath test, the exigent circumstances rule "almost always permits a blood test without a warrant." *Id*. at 2531 (plurality op.). Justice Thomas provided a fifth vote in which he concurred because he would apply a per se rule that exigent circumstances exist in a police encounter with a person suspected of drunk driving regardless of whether the driver is conscious. *Id*. at 2539 (Thomas, J., concurring). Given our analysis in this case, we need not decide whether the *Mitchell* would provide another basis for affirming the trial court's order.



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

DEAN ALAN MATTHEWS, Appellant

No. 05-18-01267-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 207th District Court, Comal County, Texas
Trial Court Cause No. CR2016-544.
Opinion delivered by Justice Reichek; Justices Pedersen, III and Carlyle participating.

Based on the Court's opinion of this date, the judgments of the trial court are **AFFIRMED**.

Judgment entered November 4, 2019