

IN THE
TENTH COURT OF APPEALS

No. 10-14-00221-CR

NOE LANCIEGO COSINO,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 361st District Court
Brazos County, Texas
Trial Court No. 12-02466-CRF-361

# O P I N I O N

Appellant Noe Cosino was charged with felony driving while intoxicated following a two-vehicle accident at the southernmost tip of Brazos County. Cosino and the driver of the other vehicle were taken to a College Station hospital for medical treatment. While Cosino was at the hospital, the investigating state trooper asked a nurse to conduct a mandatory blood draw under the authority of section 724.012 of the Transportation Code, which permits a peace officer to take a blood specimen upon refusal of the driver, where as a direct result of the accident, an individual other than the driver

has suffered bodily injury and has been transported to a hospital for medical treatment. The blood draw occurred two and one-half hours after the crash. Cosino's blood-alcohol level was .035, over four times the legal limit.

After the trial court denied Cosino's motion to suppress the results of the blood draw on Fourth Amendment grounds, Cosino pled guilty before the jury to driving while intoxicated. The jury assessed punishment at five and one-half years in prison.

On appeal, Cosino raises four issues. His first issue is whether the trial court correctly overruled Cosino's motion to suppress the blood-draw test results when the State did not have a warrant but exigent circumstances allegedly justified the blood draw.

> We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. First, we afford almost total deference to a trial judge's determination of historical facts. The judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony. When findings of fact are not entered, we view the evidence in the light most favorable to the judge's ruling and assume the judge made implicit findings of fact that support the ruling as [long as] the record supports those findings. Second, we review a judge's application of the law to the facts *de novo.* We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case.

*Cole v. State,* --- S.W.3d ---, ---, 2016 WL 3018203, at *3 (Tex. Crim. App. May 25, 2016) (footnoted citations omitted).

DPS Trooper Jason Dominguez testified that on November 12, 2010, he was the sole trooper on duty in Grimes County. As the sole state trooper on duty, Dominguez's responsibilities included all crashes that happen inside of Grimes County, but outside of a city limit. The night of November 12, 2010 was a rainy night, which increases the number of accidents that DPS has to work. During the evening, Dominguez heard radio

traffic about a reckless and possibly intoxicated driver in the area around the city of Navasota. The dispatch indicated that the reckless driver was on Highway 105 near the Grimes/Brazos County line. At the time of the dispatch, Dominguez was on the other side of the county, so Dominguez turned around and went to the location described in the dispatch.

As Dominguez was driving on Highway 105, he noticed an unusual line of cars near the Grimes County line. After pulling around the cars, Dominguez saw that there was a vehicle crash just on the other side of the Grimes County line, inside Brazos County. Dominguez was the only law-enforcement officer in the area at the time of the crash.

When Dominguez got to the crash site, it was obvious to him that two vehicles had crashed head-on in the middle of the highway. Both vehicles had substantial damage. Cosino, the driver of the truck, was still inside his vehicle, covered in blood, and was being treated by EMS. It was clear that Cosino was injured. Also injured at the scene was the driver of the other car. That driver was feeling the effects from the deployment of his air bag, as well as complaining of leg pain.

As a result of the crash, the two-lane Highway 105 was completely blocked and traffic could not pass, including EMS first-responders who were attempting to get to the scene. Dominguez stated that, in this situation, it was extremely important to try and clear the highway because this crash occurred on an unlit two-lane highway and right after a curve, which limited visibility of the crash. In addition to the location of the crash being a problem, it was raining. These problems combined to create a situation where there was a risk of further crashes until the highway was cleared.

Dominguez observed that Cosino was intoxicated; his speech was slurred, he could not recall his birth date, and there were several beer containers around his vehicle. Normally, once Dominguez observes that a person is intoxicated, he would begin a DWI investigation, but because the roadway was closed and Cosino was injured and still inside his vehicle, Dominguez focused on getting everyone secured, safe, and off the roadway.

Because the crash was in Brazos County, the trooper in Brazos County became responsible for the crash. That evening, there was only one state trooper on duty in Brazos County, Trooper Ryan Kindell. Dominguez notified Kindell of the crash, and Kindell arrived at the scene approximately forty-five minutes later. Dominguez estimated that the crash happened approximately fifteen minutes before he called Kindell.

While awaiting Kindell's arrival, Dominguez talked with witnesses at the scene and took several photographs because the rain could potentially destroy the evidence at the scene before Kindell's arrival. Dominguez also requested some wreckers from Grimes County to come to the scene to clear the highway. While Dominguez was coordinating efforts to clear the road, EMS and firefighter personnel eventually extracted Cosino and the other driver from their vehicles and transported them to a hospital in College Station. When Cosino was finally extracted from his vehicle and transported to the hospital, Kindell had not arrived.

The only other on-duty law-enforcement officer who had arrived on scene at the time Cosino was removed from the vehicle was Trooper Reeves, who had arrived from

nearby Washington County. Reeves was the only state trooper on duty in Washington County at the time of the crash. No other Brazos County law-enforcement officers were there to help at the scene of the crash, but Dominguez agreed that he could have called the sheriff's department for help if they had someone available. A plain-clothed off-duty Navasota police officer who drove up on the wreck stopped to help, as did an off-duty plain-clothed Montgomery County Constable. Besides Dominguez, the off-duty officers and Reeves were the only other officers at the scene at the time Cosino was pulled from the vehicle. As a result, Dominguez did not have an opportunity to conduct a DWI investigation on Cosino at the scene.

When Kindell arrived, Dominguez briefed him on what had occurred. Kindell assisted Dominguez and Reeves in clearing the road and attempting to get the highway back open. After the road was clear, Dominguez and Kindell followed the wreckers to complete the required inventory sheet on the vehicles because both vehicles were towed from the scene without their owners present. Dominguez and Kindell did not do the inventory sheets at the scene of the crash because of safety concerns and the rainfall. The vehicle inventory took approximately half an hour. After the inventory was complete, Kindell then left to go to the hospital in Brazos County to further investigate the crash. At the time Kindell left to go to the hospital in Brazos County, it was almost two hours since the time of the crash. Dominguez said that if Kindell had asked him to get a warrant from a Brazos County judge, he could have done so if he first got permission.

Dominguez testified that, in the past, he has attempted to get DWI blood search warrants after similar crashes. In his experience, it has taken in excess of two hours to

get a search warrant for the blood of a possibly intoxicated individual. Typically, in such an investigation, Dominguez would first go to the hospital and evaluate the person to see whether any type of field-sobriety tests could be done, or whether the person was fit to interview. Based on his findings in the interview and field-sobriety tests, he would then draft an affidavit and search warrant that can be five or six pages long. After drafting the affidavit and search warrant, he would then have to find a judge to fax the affidavit and search warrant to. After finding a judge and getting it signed, he would then have to go back to the hospital for the suspect's blood to be physically drawn. Dominguez stated that in such a situation, time is of the essence because the alcohol in the blood is being metabolized.

Kindell testified that on the night of November 12, 2010 and into the morning of November 13, 2010, he was on duty with the DPS, assigned to Brazos County. Kindell was the only on-duty trooper assigned to Brazos County that night. Kindell's duties that night included responding to any crashes that occurred in the rural areas of Brazos County. With the rain the night of November 12, 2010, Kindell stated his main duty was just waiting until a crash occurred.

Around 1:30 a.m., Kindell was called about a crash that had occurred at the extreme southern tip of Brazos County. Kindell responded to the crash, but it took him approximately forty-five minutes to get to the scene. When Kindell arrived, Dominguez was on scene, and at some point Reeves arrived. Kindell was primarily responsible for the crash because he was the trooper assigned to Brazos County, and the crash had

occurred on a highway in a rural location inside Brazos County. During the entire investigation, Kindell was the only Brazos County law-enforcement officer on scene.

On his arrival, Kindell saw that traffic was backed up on both sides of the bridge because the crash was blocking the entire highway. It appeared from the location of the vehicles that the driver of the black truck had come across the highway into oncoming traffic and had a head-on collision with the driver of a Lincoln Towncar. Neither of the drivers of the vehicles was on scene when Kindell arrived. Kindell was informed that both drivers were injured and had been taken to the hospital by ambulance. Kindell observed several alcohol containers around the black truck and also that the black truck smelled of alcohol.

Kindell and Dominguez helped clear the highway and moved the vehicles to a nearby gas station parking lot to conduct an inventory of the vehicles. The inventory took approximately ten to fifteen minutes. After finishing the inventory, Kindell drove to the College Station Medical Center to interview the drivers of both vehicles.

When Kindell arrived at the College Station Medical Center, Cosino was restrained to the bed because he was being combative and verbally abusive to the hospital staff. Kindell observed that Cosino's behavior was very aggressive, and Kindell could smell a strong odor of alcohol on Cosino. It was clear to Kindell from his observations that Cosino was intoxicated.

Kindell attempted to read the DIC-24 to Cosino to request a voluntary sample of his blood, but, every time Kindell attempted to read the statutory warning, Cosino got louder and more verbally abusive towards Kindell and the hospital staff. As a result of

Cosino's behavior, Kindell was unable to read the entire DIC-24 to him. After attempting but failing to get Cosino's cooperation, Kindell asked the registered nurse to conduct a mandatory blood draw based on the law that gives police the authority to order a blood draw when there has been a crash where an injured person was transported for medical care. On the THP-51 form for the mandatory blood draw, Kindell checked the form for "accident with death, serious bodily injury or hospital treatment for bodily injury; suspect was involved in an accident that I have reason to believe occurred as a result of the suspect's intoxication." Kindell admitted that, because he was satisfied that he had enough information for the mandatory blood draw, at the time he was not thinking about getting a warrant, but had he wanted to get a warrant, he could have done so by fax from the hospital if he found a judge with an available computer. He also said that the mandatory blood draw "was the quickest way to obtain blood to preserve the evidence."

Although Cosino continued to yell the entire time, he never specifically objected to his blood being drawn. Even though Cosino never objected to the blood draw, in Kindell's mind it was a mandatory blood draw. The blood draw occurred approximately two hours and thirty minutes after the crash.

Kindell testified that, in the past, he has obtained search warrants for blood in DWI investigations in Brazos County. Kindell testified that the process of getting a blood warrant for a DWI investigation in Brazos County typically takes an hour to an hour and a half. Kindell described the process to get a warrant as requiring the officer to first write up an affidavit. After finishing the affidavit, Kindell then has to contact a judge, which sometimes requires waiting for the judge to call Kindell back. After contacting the judge,

Kindell either has to fax the search warrant to the judge's home or physically take the search warrant to the judge's home. After faxing the search warrant, Kindell then either has to wait for the judge to read the search warrant and fax it back to him, or Kindell has to physically take the search warrant back to the medical facility. Kindell testified that in his experience, if he were to have gotten a warrant, the blood draw would not have occurred until three-and-a-half to four hours had passed since the accident. That time limit is critical because Cosino's body was actively destroying the alcohol in his system.

Kindell explained that he could not have Dominguez or another trooper handle the warrant while he handled other matters in the investigation because of the manpower shortage that the troopers had that night. Pulling either Dominguez from Grimes County or Reeves from Washington County would leave one of those rural counties without any state troopers to respond to crashes in the entire county.

In the absence of a warrant, the State has the burden to show exigent circumstances that made obtaining a warrant impractical. *Turrubiate v. State,* 399 S.W.3d 147, 151 (Tex. Crim. App. 2013). In his first issue, Cosino contends that the State did not meet its burden.

In *Cole* and in *Weems v. State*, --- S.W.3d ---, 2016 WL 2997333 (Tex. Crim. App. May 25, 2016), the Court of Criminal Appeals very recently articulated the current state of the law on exigent circumstances and warrantless blood draws.

> As [*State v.*] *Villarreal*[, 475 S.W.3d 784 (Tex. Crim. App. 2014), *reh'g denied,* 475 S.W.3d 817 (Tex. Crim. App. 2015) (per curiam)] made plain, a warrantless search is per se unreasonable unless it falls within a well-recognized exception to the warrant requirement. The exigency exception operates "when the exigencies of the situation make the needs of law

enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Exigency potentially provides for a reasonable, yet warrantless search "because 'there is compelling need for official action and no time to secure a warrant.'" Whether law enforcement faced an emergency that justifies acting without a warrant calls for a case-by-case determination based on the totality of circumstances. "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation." An exigency analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search.

In *Schmerber v. California*, [384 U.S. 757, 770–72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)] the United States Supreme Court held that, based on the circumstances surrounding the search, a warrantless seizure of a driver's blood was reasonable.

....

Adopting a totality-of-circumstances approach, the Court held that the circumstances surrounding the blood draw rendered the warrantless search reasonable: (1) the officer had probable cause that Schmerber operated a vehicle while intoxicated; (2) alcohol in the body naturally dissipates after drinking stops; (3) the lack of time to procure a warrant because of the time taken to transport Schmerber to a hospital and investigate the accident scene; (4) the highly effective means of determining whether an individual is intoxicated; (5) venipuncture is a common procedure and usually "involves virtually no risk, trauma, or pain"; and (6) the test was performed in a reasonable manner.

*Weems*, --- S.W.3d at ---, 2016 WL 2997333, at *3-4 (footnoted citations omitted).

Nearly fifty years later, the Court in *McNeely* held that the natural dissipation of alcohol in the bloodstream did not create a *per se* exigency justifying an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing. The *McNeely* Court held firm to the warrant requirement by stating that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Yet the Court still recognized the gravity of the body's natural metabolic process and the attendant evidence destruction over time. With this balance in mind, the Court adhered to a totality of the circumstances analysis with the notion that certain circumstances may permit a warrantless search of a suspect's blood. The narrow issue before

the Court prohibited it from providing an exhaustive analysis of when exigency in intoxication related offenses may be found. However, the Court provided insight on the issue by identifying a few relevant circumstances that may establish exigency in this context. In addition to the body's metabolization, they include "the procedures in place for obtaining a warrant, "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence."

*Cole,* --- S.W.3d at ---, 2016 WL 3018203, at *4 (footnoted citations omitted).

One of the factors that may create an exigency, as pointed out by the Supreme Court in *McNeely,* is the combination of a car accident with a DWI investigation*:*

Although the Missouri Supreme Court referred to this case as "unquestionably a routine DWI case," the fact that a particular drunk-driving stop is "routine" in the sense that it does not involve " '*special facts,'* "*such as the need for the police to attend to a car accident*, does not mean a warrant is required. Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.

*Missouri v. McNeely*, 133 S.Ct. 1552, 1568 (emphasis added).

The State cites *Pearson v. State,* No. 13-11-00137-CR, 2014 WL 895509 (Tex. App.—Corpus Christi, Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) as support. *See* TEX. R. APP. P. 47.7(a) ("Opinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value but may be cited with the notation, '(not designated for publication).' "). In *Pearson,* Trooper Aguilar testified that, on the night of the accident, he was the only

DPS trooper on duty and was solely responsible for securing the accident scene, collecting the evidence, and investigating the possibly intoxicated driver. *Pearson,* 2014 WL 895509, at *3. At the time Aguilar arrived at the crash scene at 4:50 a.m., the defendant and the other survivors of the crash had already been transported to the hospital. *Id.* Aguilar was informed by another officer and EMS personnel that the defendant was "wasted." *Id.* Aguilar was required to complete the investigation at the scene before he could go to the hospital to complete his investigation. *Id.* After completing his investigation at the scene, Aguilar arrived at the hospital at 10 a.m. and tried to speak with the defendant, who denied drinking and refused to give his blood. *Id.* Aguilar had the defendant's blood drawn without a warrant. *Id.* The trial court denied the defendant's motion to suppress the blood draw, rejecting the defendant's argument that Aguilar had created the exigency by waiting almost six hours before drawing his blood. *Id.* The Thirteenth Court affirmed, holding:

> We do not believe Trooper Aguilar created the exigent circumstances in this case. Trooper Aguilar testified that he was the only officer on duty that morning and that he was solely responsible for securing the scene of the accident. He testified that he traveled to the hospital as soon as he completed his duties at the accident scene, which were time-consuming and extensive. Finally, he testified that because it was a Sunday, it would have taken at least three hours to obtain a warrant from a judge, and because so much time had already passed since the accident, he could not wait for a warrant before obtaining a blood sample because the potential evidence of intoxication was rapidly degrading. The trial court was entitled to credit Trooper Aguilar's version of events. Under the record before it, the trial court could have reasonably determined that Trooper Aguilar went to the hospital as soon as was practicable considering the circumstances of that morning. Moreover, determining whether an officer impermissibly manufactured an exigency depends on " 'the reasonableness and propriety of the investigative tactics that generated the exigency.' " Based on Trooper Aguilar's explanation of the events of that morning, the trial court could

have reasonably concluded that the officer's investigative tactics were not an attempt to deliberately create exigent circumstances that would justify a warrantless blood draw. In the end, the foregoing were mixed questions of law and fact that depended on the trial court's assessment of Trooper Aguilar's credibility, and we must defer to the trial court's determination of these questions.

*Id.* (citations omitted).

In this case, Kindell was the sole trooper on duty in Brazos County at the time of collision, and he was solely responsible for the cleanup of the crash and the ensuing investigation. The other two troopers who assisted were the sole troopers on duty in their respective counties. Also, Kindell did not arrive at the scene until almost an hour after the crash, long after Cosino was taken to the hospital. Further, when Kindell arrived, the unlit highway was entirely blocked in the middle of the night while it was raining. Clearing the highway and investigating the crash were extensive activities that were time consuming, but they had to done before Kindell could leave the scene to interview Cosino at the hospital in College Station. Cosino's apparent refusal and the mandatory blood draw occurred approximately two and a half hours after the collision. Kindell testified that if he had had to get a warrant, it would have taken another hour to an hour and a half, and valuable evidence would have been lost.

Because the trial court did not enter findings of fact, we view the evidence in the light most favorable to the trial court's ruling, we assume that the trial court made implicit findings of fact that support its ruling as long as the record supports those findings, and we will sustain the trial court's ruling if the record reasonably supports it. *Cole,* --- S.W.3d at ---, 2016 WL 3018203, at *3.

In this case, the record reasonably supports the trial court's denial of Cosino's motion to suppress, and we conclude that exigent circumstances justified Kindell's warrantless blood draw. *See id.,* --- S.W.3d at ---, 2016 WL 3018203, at *5-7; *see also Pearson,* 2014 WL 895509 at *3-4. Accordingly, we overrule issue one.

In his second issue, Cosino asserts that the trial court erred in denying his motion to declare section 724.012 of the Transportation Code unconstitutional. We construe Cosino's motion to be a facial attack on the statute. In *McGruder v. State*, 475 S.W.3d 345 (Tex. App.—Waco 2015), *vacated,* 483 S.W.3d 880 (Tex. Crim. App. 2016), a majority of the court held that section 724.012 was constitutional, 475 S.W.3d at 350, but the Court of Criminal Appeals vacated our judgment for us to give the issue further consideration in light of the intervening opinions in *Villareal* and *City of Los Angeles v. Patel*, 135 S.Ct. 2442, 2449-50 (2015) (confirming that facial challenges to statutes can be brought under the Fourth Amendment).

Having considered *Villareal* and *Patel*, and noting that at least two sister courts have held that section 724.012 is constitutional,[1] we reaffirm our original decision in *McGruder* and hold that section 724.012 is facially constitutional. Issue two is overruled.

In issues three and four, Cosino asserts, respectively, that the trial court erred in

---

[1] *Gore v. State,* 451 S.W.3d 182, 189 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("While the statute does make a blood draw without consent mandatory in certain circumstances, it does not mandate a blood draw without a warrant. Thus, a nonconsensual blood draw, with a warrant, would not be constitutionally infirm."); *State v. Martinez,* No. 13-14-00117-CR, 2015 WL 1957087, at *3-4 (Tex. App.—Corpus Christi Apr. 30, 2015, no pet.) (mem. op., not designated for publication) ("An officer may comply with both the mandatory blood-draw statute and the reasonableness requirements of the Fourth Amendment by obtaining a warrant or by proceeding without a warrant if the specific circumstances of the case present an exigency sufficient to dispense with the requirement of a warrant.").

overruling his objections to the prosecutor's closing argument and that the prosecutor's argument denied Cosino due process.

After Cosino pleaded guilty, in closing argument of the trial on punishment, his attorney made the following argument:

> [DEFENSE COUNSEL]: Ladies and gentlemen, in a minute Ryan is going to come up and he's going to ask you for a term of imprisonment. *But what he's really asking is for a death sentence.* You see my client has a disease called HIV -- [Emphasis added.]

> [PROSECUTOR]: Judge – I'll withdraw that. I'll withdraw that. That's fine.

> [DEFENSE COUNSEL]: You can see here in the medical records that he has human immune deficient virus. His immune system cannot withstand exposure to disease. And they're going to ask you to send him to the cesspool, the breeding ground of disease, which is prison. *Even if you send him to prison for the minimum term of two years, he's not going to make it.* His life span right now has already been severely diminished. [Emphasis added.]

> And he's one of the nicest people you'll ever meet in your life. Look how many people are here in support of him. How many of y'all could get as many people to come down here through the driving rain to say -- show their support. I couldn't get that many people. That's the true account of who he is as a person. Not the person at the hospital who was belligerent. How many of y'all would want to be judged by your worst behavior of your life, that one time?

> The measure of who Noe is, is the people who are down here to support him. I'd like to ask you if you remember that movie "Schindler"s List." I know some of you have seen it. In "Schindler's List" Schindler is having cocktails with the head of the Nazi death camp. And the guy from the Nazi death camp says, "These people, they're only doing what we want them to do because we have power over them." And Schindler says -- Oscar Schindler said, "That's not power. Real power is mercy."

> And the guy's like -- the camp guard is, like, "What are you talking about?" And Schindler says, "The real power is having the ability to take someone's life and yet granting them mercy even when they don't perhaps

deserve it. That's real power." That's what Schindler said.

And, ladies and gentlemen, you have all the power in the world. This is a wide range, from probation all the way to ten years in prison. I am asking you, please, recommend probation. Noe's asking you to recommend probation. His family is asking you to recommend probation. The community is asking you to recommend probation. A lot of them are here yesterday -- or today. So we're asking you for justice, but please temper your justice with mercy.

In rebuttal, the State argued as follows:

[PROSECUTOR]: There's a man in that crumpled car right there. He's an elderly man named Henry Scott. And Mr. Scott has family and he has people that depend on him.

And on [November] 12th, 2010, *the man sitting right over there did everything he needed to do to kill Henry Scott*. I don't think anyone who has testified in this case has disagreed with that. I don't think anyone could rationally disagree with that, even the Defendant's own people, his friends and family have kind of had to reluctantly agree that night this man did everything he needed to do to take Henry Scott away from the people that care about him. [Emphasis added.]

[DEFENSE COUNSEL]: Your Honor, I object. Improper jury argument. He's trying to convict the Defendant for a fictitious offense.

THE COURT: It's overruled. Go ahead, sir.

[PROSECUTOR]: No one disputes that, even the Defendant's family. Which brings up an interesting point, something that occurred to me last night as I was thinking about that. *Everyone agrees that this Defendant did what he needed to do to kill Henry Scott*. The fact that Henry Scott did not die as a result of that crash had nothing to do with the Defendant. Everybody agreed. All of his people that testified agreed what the Defendant did was enough to make that happen. [Emphasis added.]

The only thing that saved Henry Scott was divine intervention, blind luck and an air bag. Okay? But what if Mr. Scott, like the Defendant had not had an air bag? What if Mr. Scott, like the Defendant --

[DEFENSE COUNSEL]: Objection, Your Honor that's improper jury argument. It's outside the record. The testimony was the Defendant's air bag didn't go off.

THE COURT: It's overruled. The jury will recall the evidence. Go ahead.

[PROSECUTOR]: What if Mr. Scott, like the Defendant, was not wearing a seatbelt? Or what if Mr. Scott had not been driving that big old Lincoln Towncar, but had been driving a much smaller, lighter car? Then you know what, I'm not standing here today talking to you about a DWI case. *I'm standing here talking to you today about a murder.* [Emphasis added.]

[DEFENSE COUNSEL]: Objection, Your Honor. That's improper jury argument. This is a DWI case, not a murder case. He's trying to try him for a fictitious and theoretical offense.

[PROSECUTOR]: That's not a legal objection, Judge. And this is absolutely proper jury argument.

THE COURT: It's overruled. You may continue.

[PROSECUTOR]: *The law in Texas clearly states that if someone is driving intoxicated and kills somebody and that individual has at least twice before been convicted of DWI, that's called murder.* [Emphasis added.]

[DEFENSE COUNSEL]: Your Honor, can I again object to that. That's improper jury argument. That's unduly prejudicial. It denies the Defendant the right to a fair trial. And I'd ask for an objection and a running objection. It's not a murder case.

THE COURT: Thank you. It's overruled. And you may have a running objection.

[PROSECUTOR]: It is causing a death during the commission of a felony, whether you intended to or not. The felony in this case being DWI. People are tried for murder under those circumstances routinely throughout Texas. I've tried people for that. *And we're standing here talking about life in prison on murder. The Defendant's conduct, according to his own people, was sufficient to make that happen.* The fact that we're not here on that has nothing to do with the Defendant or his conduct.

All we're asking for is ten.  And that's not unreasonable because, frankly, the case is worth more than that.

Jury argument is limited to: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) a plea for law enforcement.  *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999).   To determine if the prosecutor made an improper jury argument, we must consider the entire argument in context—not merely isolated instances.  *See Rodriguez v. State*, 90 S.W.3d 340, 364 (Tex. App.—El Paso 2001, pet. ref'd).  An argument that exceeds these bounds is error, but only reversible error if, in light of the record as a whole, the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts that are harmful to the accused.  *Felder v. State*, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992).

In his third issue, Cosino complains that the prosecutor's several references to murder were improper because they were outside the record and were references to a theoretical and fictitious murder offense.  In support, Cosino cites *Young v. State,* 752 S.W.2d 137 (Tex. App.—Dallas 1988, pet. ref'd).  In *Young,* the defendant was stopped for a traffic offense and asked to step out of the car.  *Id.* at 140.  While the license check was going on, the defendant asked to be able to return to his vehicle to turn the vehicle off to conserve gas.  *Id.*   When the officers discovered that the defendant's license was suspended, they arrested him and inventoried his vehicle.  *Id.*  During the vehicle search, officers discovered two loaded handguns, among other contraband.  *Id.*  During closing argument for trial on the offense of unlawful possession of a firearm by a felon, the

prosecutor repeatedly invited the jury to speculate that if the defendant had been allowed to return to the vehicle and have access to the guns, he would have attempted to harm the officers. *Id.* at 143-45. The appellate court determined that the prosecutor's argument injected new, harmful facts into the record because there was no support in the record for the prosecutor's argument that the defendant had intended to harm the officers. *Id.* at 145.

The State responds that, unlike *Young,* the prosecutor's arguments at issue did not inject any new, harmful acts by the defendant into the case. Instead, the prosecutor's argument centered on the facts of the case and the possible ramifications of Cosino's drunk-driving behavior. We agree that the arguments were a reasonable deduction from the evidence and a plea for law enforcement in light of Cosino's request for probation. *See Richards v. State,* 912 S.W.2d 374, 380-81 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (prosecutor's argument about finding body on the street was proper summation of evidence because if victim had died, he would have been a body in the street); *Gonzales v. State,* 831 S.W.2d 491, 494 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (holding that it was proper for prosecutor to ask jury to consider what would have happened if defendant had been two steps closer to victim when he thrust knife toward victim; "[t]hat appellant's swinging of the knife could have caused further injury, was as the trial court observed, a reasonable deduction from the evidence").

We also agree with the State that the prosecutor's argument was a proper summation of the evidence because it reflects what could have happened and what punishment would have been proper if Scott had not had an airbag in his vehicle. *See*

*Porter v. State,* 601 S.W.2d 721, 723 (Tex. Crim. App. 1980) (upholding as proper jury argument the statement "people get killed in armed robberies" because the defendant was armed); *Parks v. State,* 843 S.W.2d 693, 694-95 (Tex. App.—Corpus Christi 1992, pet. ref'd) (upholding the jury argument, "This is an attempted capital murder. This is the type of person, had not the police shot this guy, that we would have pictures of a dead police officer and we would be trying a death sentence case," as it was reasonable deduction from the evidence because defendant ran towards officer with a knife screaming that he was going to get him).

Lastly, we agree with the State that the prosecutor's arguments were an answer to Cosino's argument that sending him to prison was the equivalent of a "death sentence." After that argument, it was not improper for the State to argue that Cosino's drunk driving could have caused Scott's death. *See Smith v. State,* 932 S.W.2d 304, 306 (Tex. App.—Houston [14th Dist.] 1996, pet. granted) (holding that prosecutor's statement that victim was a "good guy too" was a proper response to the defense's closing argument that the defendant was a "good guy"), *aff'd,* 965 S.W.2d 509 (Tex. Crim. App. 1998).

For the above reasons, we conclude that the trial court did not err in overruling the objections to the State's argument. Issue three is overruled.

In issue four, Cosino asserts that the prosecutor's arguments involved in issue three denied him due process. One of Cosino's objections was that the argument "denies the Defendant the right to a fair trial." *See Miller v. State,* 741 S.W.2d 382, 391 (Tex. Crim. App. 1987) ("improper argument may present a Fourteenth Amendment due process claim if the prosecutor's argument so infected the trial with unfairness as to make the

resulting conviction a denial of due process.") (citing *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). The State contends that Cosino's "fair trial" objection was not specific enough to raise his due-process claim and that a trial objection stating one legal theory may not be used to support a different legal theory on appeal.

Because of our disposition of issue three, we assume without deciding that Cosino's "fair trial" objection raised his due-process claim in the trial court. In issue three, we determined that the prosecutor's arguments were not improper. Because the arguments were not improper, they did not deny Cosino due process. Issue four is overruled.

Having overruled all four issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
      (Chief Justice Gray concurs with a note)*
Affirmed
Opinion delivered and filed August 3, 2016
Publish
[CR25]

*(Chief Justice Gray concurs in the judgment of the Court to the extent that it affirms the trial court's judgment. A separate opinion will not issue. Chief Justice Gray notes, however, that on page 13 of the opinion the Court makes the unnecessary statement that there was an "apparent refusal" to the blood draw by Cosino. The record would support a conclusion by the trial court that Cosino did not withdraw his implied consent. But whether there was or was not a refusal is not important to the Court's opinion. What is important in the broader context of the analysis, however, is whether a suspected DWI driver withdrew the driver's implied consent to the blood draw that the

statute provides. That is why the statute is not facially unconstitutional. The statute provides implied consent in the circumstances defined. Consent is a well-recognized exception to the warrant requirement. When *McGruder* was written, the only very narrow issue squarely before the Court was whether the statute always operated unconstitutionally. We held that it did not. *See McGruder v. State*, 475 S.W.3d 345, 349-50 (Tex. App.—Waco 2014), *vacated and remanded by,* 483 S.W.3d 880 (Tex. Crim. App. 2016). The reason is that in the defined circumstances it simply implies consent. Consent can be given; expressly or by implication. But more important to the discussion of what has been termed "mandatory blood draws" under the statute, consent, including implied consent, can be withdrawn. In all the cases other than *McGruder*, the question involved, in part, whether the "mandatory blood draw" could be taken over the objection of the driver, or more precisely, after the driver's implied consent had been expressly withdrawn. The United States Supreme Court has now provided more guidance in the nature of the validity and pitfalls of certain statutes as they relate to taking breath or blood samples from persons who are believed to be intoxicated and whether and how that evidence can be used. *See Birchfield v. North Dakota*, ___ U.S. ___, ___ S.Ct. ___, 195 L. Ed. 2d 560 (2016). This issue is far from being fully and finally resolved and is an area that is ripe for modification by the legislature and clarification by judicial interpretation. Thus, it is unnecessary to burden this case with further discussion and analysis upon the concurrence that the trial court's judgment does not contain reversible error.)

