# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00727-CR

**The State of Texas, Appellant**

**v.**

**John Phillip Couch, II, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. CR2013-444, HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Texas Department of Public Safety Trooper David Kral arrested John Phillip Couch, II, following an automobile accident, for driving while intoxicated. Kral then transported Couch to a hospital, where his blood was drawn without a search warrant. The State later charged Couch with intoxication assault and aggravated assault with a deadly weapon. Before trial, Couch moved to suppress the blood-draw results as an unreasonable search and seizure under the Fourth Amendment.[1] The district court granted the motion. Because the totality of the circumstances at the time of the blood draw satisfied the exigent-circumstances exception to the warrant requirement, we reverse.

---

[1] *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

## BACKGROUND[2]

Around 8:00 p.m. on February 25, 2012, Kral was notified of a vehicle collision in Comal County, on FM 306 near Canyon Park Road. Kral arrived at the scene approximately 30 minutes later. Upon arrival, Kral saw that a Corvette and a Chevy pickup truck had collided in the roadway and were blocking traffic. Emergency personnel and law-enforcement officers were already at the scene. Kral spoke with a sheriff's deputy who informed him that eyewitnesses had observed the driver of the Corvette, later identified as Couch, "driving recklessly within the parking lot" of a convenience store and "attempting to get onto [FM] 306." The deputy added that as the Corvette was exiting the parking lot, it "went into the wrong lane and went head on with another vehicle." There were two individuals in the Chevy pickup at the time of the collision, one of whom was hospitalized with a broken thumb.

As the lead investigator at the scene, Kral was responsible for "[g]athering all the facts as far as where the vehicles were on the roadway," "getting . . . certain documents from the crash," "identifying the other occupants of the crash," "getting witness statements," and speaking with "the other deputies that were there on scene." As the only trooper present, Kral alone could complete a written report of the collision. The role of the other officers was to "assist[] with the overall crash scene" by "getting witness statements," "identifying drivers," "getting facts," and "securing the scene, making sure that—that nobody else crashes into these cars while they're just sitting in the middle of the road."

---

[2] The following recitation of facts is based on the evidence admitted at the suppression hearing, including testimony by Trooper Kral, whom the district court found to be a "truthful and credible witness."

2

While the other officers were completing those tasks, Kral spoke with Couch. He noticed that Couch "had an abrasion across [the] left part of his head, and he was also complaining of his chest." As a precautionary measure, Kral "brought him over to Canyon Lake EMS personnel," who informed Kral that they had already "checked [Couch] over" and that he "had refused any further treatment."

Kral then brought Couch to his patrol car and asked him questions pertaining to the collision. Kral smelled alcohol on Couch's breath and suspected that he was intoxicated. Kral administered field sobriety tests to Couch to confirm his suspicions and arrested Couch for driving while intoxicated.[3] Before leaving the scene of the collision, Kral spoke with the other officers to inform them of Couch's arrest, "check the status" of the occupants in the other vehicle, and ensure that the collision clean-up was under control.[4] Kral then transported Couch to a hospital in downtown New Braunfels, a drive that took around 45 minutes.

Upon arrival at the hospital, Kral began drafting a search warrant to draw Couch's blood. It would not have been "practical" to prepare the warrant earlier because Kral was still gathering facts, and the other officers at the scene had other responsibilities that required their attention. The process of drafting a warrant takes "roughly 30 minutes" and, "[a]fter completing [and] proofreading it," Kral would need to find a judge to sign the warrant. The "majority of judges [] just do it by fax," although some judges "will come to the hospital and personally sign it." Under

---

[3] Couch exhibited 6 of 6 indications of intoxication on the horizontal gaze nystagmus (HGN) test; 3 of 8 indications on the walk-and-turn test; and 2 of 4 indications on the leg/stand test. Couch's field breath-test specimen result was .147.

[4] 10 to 20 minutes elapsed between the time of Couch's arrest and their departure from the scene.

3

the "best-case scenario," it would take "roughly 20 minutes" after Kral's preparation of a warrant for a judge to sign it, and under the "worst-case scenario," it would take "an hour and a half, two hours." Roughly two hours passed from the time of Kral's dispatch to his arrival at the hospital. It would have taken Kral an additional 50 minutes to two hours to draft a warrant and obtain a judge's signature.

Kral needed to obtain a blood sample to determine Couch's blood-alcohol content at the time of the collision. Kral explained that "the human body metabolizes alcohol, so it dissipates after a certain point." He was concerned that adding another hour or two to the time that had already elapsed following Couch's arrest created a risk that the test results would not be "accurate." "The longer that we . . . wait past the time of arrest, the lower that blood-alcohol content is going to be," he explained.

Also, at some point prior to Couch's arrest, Kral asked Couch "if he had anything else in his system or if there's anything else in the car." Couch, who was the owner of the Corvette, stated that there was marihuana in the center console of his vehicle, inside a pill bottle. After making this admission, Couch then took a pill bottle out of his pocket that contained a "green leafy substance."

Although Couch claimed that he had not smoked any marihuana that day, and Kral "had no idea" of the rate at which marihuana metabolizes in a person's bloodstream, Kral suspected that marihuana might also be present in Couch's blood. This was another reason to "get that specimen in a timely manner." And since Couch was still complaining of chest and head pain, Kral worried that any treatment that Couch might receive at the hospital would interfere with the blood

4

draw. It could further delay the process or taint the blood sample with other substances such as pain medication.

Kral ultimately decided to forgo the search-warrant process and obtain a sample of Couch's blood without a warrant under the mandatory blood draw statute, Texas Transportation Code section 724.012(b).[5] When asked if he believed that he "would have had time to get a search warrant and adequately get an accurate and reliable blood analysis done on the defendant," Kral answered, "No." Kral obtained a sample of Couch's blood at approximately 10:50 p.m.

On cross-examination, Kral acknowledged that there was a "24/7 no-refusal policy" in place in Comal County at the time of Couch's arrest. It provided "access and mechanisms" for officers to obtain warrants, although Kral disputed Couch's characterization of this policy as "an easy process." Kral also acknowledged that he did not know if any of the other officers who were present at the scene of the collision might have been able to obtain a search warrant or transport Couch to the hospital. But he emphasized that during the investigation, the officers were busy "doing exactly what they needed to be doing in that specific instance to assist [Kral] with that crash investigation." Kral added: "They were all out scattered, doing work. So blocking traffic, notifying

---

[5] *See* Tex. Transp. Code 724.012(b) (permitting warrantless blood draw if, among other reasons, "an individual other than the [suspect] has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment"). In this case, one of the occupants of the other vehicle had been injured and transported to a hospital for medical treatment. Thus, at the time of Couch's arrest, the statute permitted Couch's blood to be drawn without a warrant.

However, in 2014, the Texas Court of Criminal Appeals held that "a nonconsensual search of a DWI suspect's blood conducted pursuant to the . . . Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment." *State v. Villarreal*, 475 S.W.3d 784, 815 (Tex. Crim. App. 2014).

5

communications of driver's license information, vehicle information, getting wreckers en route, talking to witnesses, things like that." Kral also believed that it would not have been "practical" for him to stop what he was doing during the investigation and take the time to explain to another officer the basis for obtaining a warrant: "It wouldn't have been practical because . . . . I'm the investigator. I'm the one with all the pertinent—the totality of the circumstances are on my plate."

Also admitted into evidence at the suppression hearing was a copy of a video recording taken from Kral's patrol-car dash camera. The recording largely confirmed Kral's testimony and provided additional information as to the events that occurred at the hospital. It showed Kral parked in his patrol car at the hospital parking lot, speaking with Couch and discussing the process for obtaining a warrant with other officers, beginning to draft the search warrant on his laptop computer, and unsuccessfully attempting to contact a judge to sign the warrant, before ultimately deciding to forgo the warrant process altogether.

At the conclusion of the hearing, the district court took the matter under advisement and later granted the motion to suppress, concluding that the drawing of Couch's blood constituted a warrantless search and seizure and that "the overall circumstances of the incident do not demonstrate exigent circumstances so compelling that a warrantless, non-consensual blood draw was objectively reasonable." This appeal by the State followed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). "The record will be viewed in the light most favorable to the trial

6

court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *Id*. (citing *Dixon*, 206 S.W.3d at 590; *Montgomery v. State*, 810 S.W.2d 372, 391–92 (Tex. Crim. App. 1991)). "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case." *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

Additionally, "[w]e review a trial judge's ruling on a motion to suppress under a bifurcated standard of review." *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016) (citing *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013)). First, we are to "afford almost total deference to a trial judge's determination of historical facts," as "[t]he judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony." *Id*. (citing *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010)). Therefore, "[w]hen the trial judge makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them, regardless of whether the motion to suppress was granted or denied." *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011) (citing *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "Second, we review a judge's application of the law to the facts de novo." *Cole*, 490 S.W.3d at 922. This includes the legal question of whether exigent circumstances justified a warrantless search or seizure. *See Valtierra*, 310 S.W.3d at 447; *Roop v. State*, 484 S.W.3d 594, 597–98 (Tex. App.—Austin 2016, pet. ref'd).

7

**ANALYSIS**

Reasonableness is the "ultimate touchstone" of the Fourth Amendment's protection against unreasonable searches and seizures. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). A warrantless blood draw "is reasonable only if it falls within a recognized exception" to the warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013).

A well-recognized exception controls this case. This exception "'applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Id*. at 148–49 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Exigent circumstances include "the need to prevent the destruction of evidence." *Preston v. United States*, 376 U.S. 364, 367 (1964).

In DWI cases, the evidence at risk of destruction is a suspect's blood-alcohol content, which "begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Schmerber v. California*, 384 U.S. 757, 770 (1966). Accordingly, the warrantless collection of blood from a DWI suspect does not violate the Fourth Amendment in cases where the arresting officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Id*. (quoting *Preston*, 376 U.S. at 367).

Recently, however, the United States Supreme Court rejected the contention that "the natural metabolization of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *McNeely*, 569 U.S. at 145. Instead, "exigency in this context must be

8

determined case by case based on the totality of the circumstances." *Id.* The proper analysis demands "an objective evaluation of the facts reasonably available to the officer at the time of the search." *Cole*, 490 S.W.3d at 923 (citing *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)).

Relevant facts in the exigency analysis include the officer's knowledge of "the body's natural metabolic process and the attendant evidence destruction over time," "the procedures in place for obtaining a warrant," "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *McNeely*, 569 U.S. at 164. Moreover, when the circumstances include an automobile accident, additional considerations include "the time required to complete the accident investigation," "the lack of available law enforcement personnel" to assist in the investigation, "[t]he accident's severity," and the "potential medical intervention," if any, that the circumstances require. *Cole*, 490 S.W.3d at 925–27.

Courts review "the totality of the circumstances found in the record" to determine whether the facts justify a warrantless blood draw. *Weems v. State*, 493 S.W.3d 574, 580 (Tex. Crim. App. 2016). Courts are not to "pronounce what law enforcement ideally should have done in a particular case after all the facts are known," because "hindsight distorts a proper exigency analysis's focus: whether officers had a reasonable belief that obtaining a warrant was impractical based on the circumstances and information known at the time of the search." *Cole*, 490 S.W.3d at 925. Instead, courts consider "the practical problems and considerations found in the record that made obtaining a warrant impractical." *Id.*

9

Here, multiple factors justify the warrantless blood draw. This case involves an accident investigation, which the United States Supreme Court and the Texas Court of Criminal Appeals have identified as a factor that supports a finding of exigency. *See Schmerber*, 384 U.S. at 770–71; *Cole*, 490 S.W.3d at 925–26. Although the district court found that this was not an accident in which officers had to take "extreme action" to extract passengers from the vehicles or exercise "extraordinary effort" in clearing the scene, two vehicles had collided in the roadway and were blocking traffic. One of the deputies at the scene described the accident as one vehicle colliding "head on with another vehicle." The accident was serious enough that emergency personnel and several officers had been dispatched to the scene. And one of the vehicle occupants had to be transported via ambulance to a hospital for treatment.

Further, "the availability of other officers is a relevant consideration in an exigency analysis." *Cole*, 490 S.W.3d at 926. In *Cole*, the other officers present at the scene of a collision "were all performing important law enforcement or public-safety duties." *Id*. "Taking any one of them away . . . would have left a necessary duty unfulfilled." *Id*. And while the investigation continued, there was no "readily available officer who could have gotten a warrant." *Id*.

Additionally, the officers who had been dispatched to the scene of the collision were not idle observers. Instead, they were busy "working, doing exactly what they needed to be doing" to assist with the investigation. Their tasks included "getting witness statements," "identifying drivers," "getting facts," and "securing the scene, making sure . . . that nobody else crashes into these cars while they're just sitting in the middle of the road." Kral testified that he had similar duties. As the lead accident investigator, however, he also had to prepare a written report based on all of the

information that he and the other officers had gathered during the investigation. While Kral was on the scene, he had to interview Couch, have him examined by EMS, administer field sobriety tests to him once he suspected that Couch had been driving while intoxicated, and ultimately arrest him for that offense. These tasks took Kral approximately 20 to 30 minutes to complete. Kral believed that it would not have been "practical" for him to stop what he was doing during the investigation and prepare a warrant or direct another officer to prepare a warrant for him. As Kral explained, "I'm the investigator. . . . The totality of the circumstances are on my plate."

Also relevant to the exigency analysis is the location of the suspect's arrest in relation to hospitals, jails, or other facilities where blood can be drawn, because that affects the timing of any blood draw. *See, e.g.*, *Cosino v. State*, 503 S.W.3d 592, 600–01 (Tex. App.—Waco 2016, pet. ref'd); *State v. Robinson*, No. 03-15-00153-CR, 2016 Tex. App. LEXIS 11088, at *24 (Tex. App.—Austin Oct. 12, 2016, pet. ref'd) (mem. op., not designated for publication). Here, the collision occurred in Comal County on FM 306 near Canyon Park Road. A drive from that location to Highway Patrol headquarters, the sheriff's office, or the nearest hospital in New Braunfels would take approximately 45 minutes. Kral was dispatched to the collision at 7:53 p.m. He did not arrive at the scene until approximately 30 minutes later and did not arrest Couch until approximately 9:04 p.m. Following Couch's arrest, the drive from the scene of the collision to the hospital took approximately 45 minutes, and Kral and Couch did not arrive at the hospital until approximately 10:05 p.m, over two hours after the collision had occurred. Such a delay supports a conclusion that exigent circumstances were present. *See Schmerber*, 384 U.S. at 770–71 (concluding that, "where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident,"

11

officer could have reasonably concluded that "there was no time to seek out a magistrate and secure a warrant"); *see also Schneider v. State*, No. 03-14-00189-CR, 2016 Tex. App. LEXIS 3505, at *15–16 (Tex. App.—Austin Apr. 6, 2016, pet. ref'd) (mem. op., not designated for publication) (holding that, although "a traffic accident alone does not constitute an exigency," "the need to investigate a traffic accident can contribute to the exigency of a situation").

Other relevant considerations include the officer's knowledge of "the body's natural metabolic process and the attendant evidence destruction over time," "the procedures in place for obtaining a warrant," "the availability of a magistrate judge," and "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *See McNeely*, 569 U.S. at 164. Kral was aware that alcohol in a person's bloodstream "dissipates after a certain point," that adding an hour or two to the time that had already elapsed following Couch's arrest created a risk that the test results would not be "accurate," and that the longer the delay "past the time of arrest, the lower that blood-alcohol content is going to be."

Moreover, although Kral acknowledged that there were procedures in place for obtaining a warrant, including the ability of magistrates to sign a warrant via fax, he testified that this was "certainly not an easy process." Kral explained that a warrant usually takes "roughly 30 minutes" to draft and that, "[a]fter completing [and] proofreading it," he would need to find a judge to sign the warrant. According to Kral, obtaining a judge's signature could take between 20 minutes to two hours, depending on the circumstances. On the night in question, Kral did not forgo the warrant process until after his initial attempt to contact a judge was unsuccessful, which was approximately 30 minutes after his arrival at the hospital. At that time, over two-and-a-half hours

12

had elapsed since the collision had been reported, and Kral could have reasonably concluded that any additional delay to wait for a judge's signature would have increased the risk that the sample would not accurately reflect the substances that were in Couch's bloodstream at the time of the collision. The district court found that if Kral had obtained a warrant, he "would have likely obtained the Defendant's blood by about 11:05, give or take 15 minutes." As the State observes, however, this represented the "best-case scenario." Under the "worst-case scenario," waiting for a judge to sign a warrant could have delayed the blood draw by at least an additional hour.

Finally, Kral was concerned that Couch might receive treatment at the hospital that would further delay the blood draw or taint the results. Although the district court found that it was "unlikely" that potential medical intervention at the hospital would have impeded or delayed the blood draw, it was at least possible that medical intervention could have occurred prior to Kral obtaining a warrant.

Couch appeared to be injured at the scene of the collision and was complaining of head and chest pain when they arrived at the hospital. As a result, doctors decided to perform a CAT scan on Couch. Kral was concerned that doctors might also administer pain medication to Couch before Kral was able to obtain a search warrant and that any such medication would taint the blood sample. An officer's "reasonabl[e] concern[] that the administration of pain medication, specifically narcotics, would affect the blood sample's integrity" is another factor that weighs in favor of a finding of exigency. *See Cole*, 490 S.W.3d at 926.

In summary, the circumstances in this case include a two-vehicle collision that had resulted in injuries and that was blocking the road; the need for multiple officers to investigate the

13

collision and determine its probable cause before a warrant could be prepared; a DWI suspect who needed to be transported to a hospital that was approximately 45 minutes from the scene of the collision; an unsuccessful attempt by the arresting officer to find a judge to sign a search warrant approximately 30 minutes after the officer had arrived at the hospital with the suspect; the possibility that obtaining a search warrant could delay the blood draw by at least another hour; a reasonable concern that the suspect could receive medical intervention at the hospital that might interfere with the blood draw; and an awareness by the arresting officer that the suspect's blood-alcohol content was diminishing and that over two-and-a-half hours had elapsed since the collision had occurred.

These circumstances in their totality demonstrate that Trooper Kral "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Schmerber*, 384 U.S. at 770; *Cole*, 490 S.W.3d at 927. Accordingly, the warrantless blood draw did not violate the Fourth Amendment, and the district court erred in concluding otherwise. On this record, we conclude that the district court abused its discretion in granting the motion to suppress.

We sustain the State's sole issue on appeal.

## CONCLUSION

We reverse the district court's order granting the motion to suppress and remand the case to the district court for further proceedings consistent with this opinion.

_____
Michael Toth, Justice

Before Chief Justice Rose, Justices Goodwin and Toth

14

Reversed and Remanded

Filed:   October 31, 2018

Do Not Publish